# UNITED STATES CODE CONGRESSIONAL AND ADMINISTRATIVE NEWS

## 104th Congress—First Session
## 1995

Convened January 4, 1995

Adjourned January 3, 1996

## Volume 2

LEGISLATIVE HISTORY:
PUBLIC LAWS 104-11 to 104-89,
104-93, and 104-95 to 104-98
PROCLAMATIONS
EXECUTIVE ORDERS
TABLES and INDEX

WEST PUBLISHING CO.
ST. PAUL, MINN.

# PAPERWORK REDUCTION ACT OF 1995

P.L. 104–13, see page 109 Stat. 163

DATES OF CONSIDERATION AND PASSAGE

Senate: March 6, 7, April 6, 1995

House: February 22, March 10, April 6, 1995

Cong. Record Vol. 141 (1995)

Senate Report (Governmental Affairs Committee)
No. 104–8, Feb. 14, 1995
[To accompany S. 244]

House Report (Government Reform and Oversight Committee)
No. 104–37, Feb. 15, 1995
[To accompany H.R. 830]

House Conference Report No. 104–99 Apr. 3, 1995
[To accompany S. 244]

*The Senate bill was passed in lieu of the House bill after amending its language to contain much of the text of the House bill. The House Report (this page) is set out below and the House Conference Report (page 239) follows.*

## HOUSE REPORT NO. 104–37

[page 1]

The Committee on Government Reform and Oversight, to whom was referred the bill (H.R. 830) to amend chapter 35 of title 44, United States Code, to further the goals of the Paperwork Reduction Act to have Federal agencies become more responsible and publicly accountable for reducing the burden of Federal paperwork on the public, and for other purposes, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

[page 2]

BILL SUMMARY

In brief, H.R. 830, the Paperwork Reduction Act of 1995 is intended to:
(1) Reauthorize appropriations for the Office of Management and Budget's (OMB) Office of Information and Regulatory Af-

## PAPERWORK REDUCTION ACT
P.L. 104-13

fairs (OIRA) for an indefinite period of time, to carry out the provisions of the Paperwork Reduction Act of 1980, as amended;

(2) Strengthen OIRA and agency responsibilities for the reduction of paperwork burdens on the public, particularly through the inclusion of all Federally sponsored collections of information in a clearance process involving public notice and comment, public protection, and OIRA review;

(3) Establish policies to promote the dissemination of public information on a timely and equitable basis, and in useful forms and formats;

(4) Strengthen agency accountability for managing information resources in support of efficient and effective accomplishment of agency missions and programs; and

(5) Improve OIRA and other central management agency oversight of agency information resources management (IRM) policies and practices.

The legislation is premised on the Committee's continuing belief in the principles and requirements of the Paperwork Reduction Act of 1980. All of the legislation's amendments to the 1980 Act, as amended in 1986, are intended to further its original purposes—to strengthen OMB and agency paperwork reduction efforts, to improve OMB and agency information resources management, including in specific functional areas such as information dissemination, and to encourage and provide for more meaningful public participation in paperwork reduction and broader information resources management decisions.

The legislation is drafted in the form of a revision of the Act due to the number of amendments. These amendments include word changes made for reasons of clarity and consistency, the deletion of obsolete provisions (e.g., out-dated deadlines), the reorganization of sections, and substantive changes to update and strengthen the original purposes of the Act. To the extent the legislation is a restatement of the 1980 Act, as amended in 1986, the scope, underlying purposes, basic requirements, and legislative history of the law are unchanged. To the extent legislation modifies provisions in current law, the amendments are made strictly for the purposes described in this report, and in order to further the purposes of the original law.

With the regard to the reduction of information collection burdens, the legislation increases the Act's 1986 goal of an annual five percent reduction in public paperwork burdens to ten percent. OMB is required to include in its annual report to Congress recommendations to revise statutory paperwork burdens if this ten percent reduction goal is not reached. The legislation includes third-party disclosure requirements in the definition of collection of information to overturn the Supreme Courts decision, *Dole v. United Steelworkers of America* (494 U.S. 26 (1990)). This will ensure

[page 3]

that collection and disclosure requirements are covered by the OMB paperwork clearance process. The Act is also amended to re-

165

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37

quire each agency to develop a paperwork clearance process to review and solicit public comment on proposed information collections before submitting them to OMB for review. Public accountability is also strengthened through requirements for public disclosure of communications with OMB regarding information collections (with protections for whistleblowers complaining of unauthorized collections), and for OMB to review the status of any collection upon public request. In combination with more general requirements, such as encouraging data sharing between the Federal Government and State, local, and tribal governments, the legislation strives to further the Act's goals of minimizing Government information collection burdens, while maximizing the utility of Government information.

The legislation also adds further detail to strengthen other functional areas, such as statical policy and information dissemination. The dissemination provisions, for example, delineate clear policies that were not articulated in the Act's previous references to dissemination. The provisions require OMB to develop government-wide policies and guidelines for information dissemination and to promote public access to information maintained by Federal agencies. In turn, the agencies are to: ensure that the public has timely and equitable access to public information; solicit public input on their information dissemination activities; and not establish restrictions on dissemination or redissemination. Emphasis is placed on efficient and effective use of new technology and a reliance on a diversity of public private sources of information to promote dissemination of Government information, particularly in electronic formats.

With regard to over-arching information resources management (IRM) policies, the legislation charges agency heads with the responsibility to carry out agency IRM activities to improve agency productivity, efficiency, and effectiveness. It makes program officials responsible and accountable for those information resources supporting their program. The IRM mandate is strengthened by focusing on managing information resources in order to improve program performance, including the delivery of services to the public and the reduction of information collection burdens on the public.

To improve accountability for agency IRM responsibilities, as well as responsibilities for paperwork reduction, the agency responsibilities provided in the Act are amended to complement and more directly parallel OMB's functional responsibilities. Further, to prompt agencies to reform their management practices, the bill requires each agency head to establish an IRM steering committee, develop an IRM strategic planning process, and develop IRM performance measures linked to program performance. In these various pursuits, the goal is to integrate the management of information resources with program management and assure the use of the resources to achieve agency missions, With the Federal Government spending approximately $25 billion a year on information technology, the stakes are too high not to press for the most efficient and effective management of information resources. The reduction of information collection burdens on the public and maxi-

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 4]

mizing the utility of Government information will not otherwise occur.

SCOPE OF COMMITTEE REVIEW

H.R. 830, the Paperwork Reduction Act of 1995, was introduced on February 6, 1995, by Government Reform and Oversight Committee Chairman William F. Clinger, Jr., for himself, Congressmen Norman Sisisky, David McIntosh, Chairman of the Subcommittee on National Economic Growth, Natural Resources, and Regulatory Affairs, and other Members of Congress.

After introduction, H.R. 830 was referred to the Committee on Government Reform and Oversight. On February 6, 1995, Chairman Clinger referred the bill to the Subcommittee on National Economic Growth, Natural Resources, and Regulatory Affairs for consideration. On February 7, 1995, the Subcommittee, under the direction of Chairman McIntosh, held a hearing to consider reauthorization of appropriations for the Paperwork Reduction Act, OIRA's implementation of the Act, and OIRA's conduct of regulatory review under presidential executive order. Testimony included comment and discussion of H.R. 830.

Witnesses at the February 8, 1995 hearing were: The Honorable Sally Katzen, Administrator, Office of Information and Regulatory Affairs; Mr. James McIntyre, former Director of the Office of Management and Budget and currently an attorney; Mr. James Miller, former Director of the Office of Management and Budget and current Chairman of the Citizens for a Sound Economy; Mr. Gene Dodaro, Assistant Comptroller General, General Accounting Office accompanied by Mr. Chris Hoenig, also of GAO; Mr. Robert Coakley, Executive Director, Council on Regulatory and Information Management; Jack Sheehan, Legislative Director, United Steelworkers of America; and Bob Stolmeier, President, KLC Corporation.

At the hearing, Clinton Administration witness Sally Katzen testified squarely in support of H.R. 830.

> It is truly gratifying to be here today in what I hope is the last phase of improving and strengthening the Paperwork Reduction Act. For more than two years Congress has had legislative proposals to update and expand the Paperwork Reduction Act consistent with and building upon its original purposes. My commendations to the congressional staff who have worked professionally and constructively to develop a consensus, a bipartisan approach, which is contained in H.R. 830 and in the Senate, 244, which the Senate Governmental Affairs Committee reported out on February 1. *We are pleased to report that the administration supports those efforts.* (Emphasis added.)

After taking into consideration the testimony of the witnesses at the February 7 hearing, and after further consultation with the staff of the House Small Business Committee, the Senate Committee on Governmental Affairs, and with staff of the General Accounting Office and Office of Management and Budget, the Subcommittee held a mark-up of H.R. 830 on February 8, 1995. The full Committee held its markup on February 10, 1995 and voted,

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 5]

40 in favor and 4 against, to report H.R. 830, as amended, favorably to the full House.

The Paperwork Reduction Act was also considered during a January 27, 1995 hearing of the Committee on Small Business. Their findings, transmitted in a letter to Committee Chairman Clinger, are found under "Chapter X, Oversight Findings."

DISCUSSION

A. OVERVIEW

For the American public, Government information often seems to serve either of two quite different purposes. It can be the means by which the dedicated public servant uncovers problems, reaches decisions, enforces laws, delivers services, and informs the public. But it also can be the means by which the faceless bureaucrat asks time-consuming or intrusive questions, forces seemingly arbitrary changes in business practices or personal behavior, and imposes significant costs on the economy.

These two views of Government information have led to far different perspectives on how the Government should manage its information activities. The Paperwork Reduction Act reflects both the tensions between these perspectives and the legislative effort to create a comprehensive management framework equal to the task of managing both sides of the seemingly divergent nature of Government information (which includes information collected, maintained, or disclosed by or for the Government).

The Paperwork Reduction Act arose from the recommendations of the 1977 Federal Paperwork Commission. In the Commission's October 3, 1977, "Final Summary Report to the President," Commission Chairman Frank Horton stated,

> Many people feel, and the Commission agrees, that a multibillion dollar wall of paperwork has been erected between the Government and the people. Countless reporting and recordkeeping requirements and other heavy-handed investigation and monitoring schemes have been instituted based on what we view as a faulty premise that people will not obey the laws and rules unless they are checked, monitored, and rechecked.
>
> This situation and this assumption must be reversed if we are to restore efficiency within Government and confidence in Government by the people and if we are to realize the potential for cooperative attainment of our goals as a Nation.

The Committee on Government Reform and Oversight, nearly 20 years later, agrees and believes that more must be done to restore the American people's faith in their Government. The Paperwork Reduction Act of 1980, being the first step towards that goal, combined a revitalized paperwork clearance process (that had originated in the Federal Reports Act of 1942) with government-wide requirements for "information resources management" (IRM). Key to the success of the Act were its mandates for OMB leadership, agency management, and meaningful public participation in the development and implementation of IRM policy.

168

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 6]

Fifteen years after the original Act's enactment, the Committee not only continues to believe very strongly in the Act's purposes and requirements, but also believes that additional steps can be taken both to further paperwork reduction and to strengthen IRM. Again, the key to success involves creating a constant level of OMB leadership, strengthening agency management, and encouraging more effective public participation.

Despite widespread support for the Act, the Committee recognizes that it has not been totally successful. Federal information collection burdens continue to mount. According to the January, 1995 edition of Government Executive magazine, the number of pages of rules printed in the Federal Register climbed from an annual average of 50,618 during President Reagan's eight years in office to an average of 53,596 during the Bush Administration. In 1993 and 1994, the annual page count has averaged over 61,000. The increase of Federal Register pages during the Clinton Administration is 15 percent from the Bush Administration and 22 percent from the Reagan Administration. Although the number of pages in the Register is a crude means to measure regulatory and paperwork burdens, increases this substantial cannot be ignored. Not only OMB, but agencies too, must do more to reduce these regulatory and paperwork burdens.

A major purpose of the 1995 legislation, therefore, is to strengthen the Act's paperwork control requirements by:

    (1) Clarifying the scope of OMB review;
    (2) Expanding public notice and comment, and public protection provisions;
    (3) Specifying agency paperwork reduction responsibilities; and
    (4) Looking for innovations in information technology to reduce paperwork burdens.

Additional steps can be taken, but fall outside the scope of this specific Act. The Committee and Congress, for example, will consider various other reforms to the regulatory process. These include the imposition of a cost/benefit analysis to all regulations, a regulatory moratorium to allow Congress to review proposed regulations, and established criteria for risk assessment. With these much needed changes, the Committee believes greater progress can be made in reducing Government paperwork burdens on the public.

The reduction of public paperwork burdens will also be served by the legislation's other management focus. The still widening gap between possibilities for improved Governmental operations through the use of information technology, and the Government's apparent inability to take advantage of this technology, demonstrates that the Act's IRM mandates have not been sufficiently realized. Today's information systems offer the Government unprecedented opportunities to provide services of a higher quality tailored to the public's changing needs, delivered more effectively, faster, at lower cost, and with reduced burdens on the public. Unfortunately, Federal agencies have not kept pace with evolving management practices and skills necessary to: (1) precisely define critical information needs; and (2) select, apply, and manage changing information technologies. The result, in many cases, has been wasted resources, a frustrated public unable to get quality service,

169

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 7]

and a Government ill-prepared to measure and manage its affairs in a acceptable, businesslike manner. Despite spending more than $200 billion on information management and systems in the past 12 years, the Government has too little evidence of meaningful returns. The consequences—poor service quality, high costs, low productivity, unnecessary risks and burdens, and unexploited opportunities for improvement—cannot be tolerated.

Thus, another important purpose of the 1995 legislation is to revise the Act's IRM requirements to refocus the attention of Federal managers on the pressing need to make information technology support programs efficient and effective. The Federal Government's annual expenditure of approximately $25 billion on information technology is seriously compromised by inadequate and irresponsible systems planning, design, acquisition, and management. These amendments are intended to fight waste, reduce burdens, and strengthen accountability through greater and more clearly delineated OMB and Federal agency IRM responsibilities.

A third important issue that requires legislation is the matter of information dissemination. The advent of the electronic information age presents new opportunities and obligations for the Federal Government as it strives to fulfill its continuing responsibility to make Government information accessible to the American public. The legislation meets this need by providing for improved dissemination of Government information to the public, particularly in electronic formats. The bill establishes basic dissemination policies and principles, mandates the development of an effective information locator system and integrates access and dissemination planning into the management of Government information.

B. THE PAPERWORK REDUCTION ACT OF 1980

Enactment of the Paperwork Reduction Act of 1980 originated from an effort to modernize the Federal Reports Act of 1942. The Reports Act authorized the Bureau of the Budget (OMB's predecessor) "to coordinate Federal reporting services, to eliminate duplication and reduce the cost of such services, and to minimize the burdens of furnishing information to Federal agencies." The core of the current law's concern for reducing information collection burdens and improving the management of Federal information resources is found in this 52-year-old statutory mandate.

In the mid-1970s, growing public complaints about Government "red tape" led Congress to create the Commission on Federal Paperwork. The Commission reported in 1977 that the annual cost of Federal paperwork was $100 billion and that there were serious "structural and procedural flaws" in the Reports Act clearance process that "preclude it from ever being fully successful in controlling the total paperwork burden on the American public."

The Commission did not, however, simply recommend improvements in the paperwork clearance process. It saw that the red tape problem was part of a much larger problem—fragmented, inefficient, and ineffective management of information in the emerging electronic age. As the Commission noted in its September 9, 1977 report titled, "Information Resources Management: A Report of the Committee on Federal Paperwork":

170

## PAPERWORK REDUCTION ACT
P.L. 104–13
[page 8]

A simple bureaucratic reorganization of traditional records and paperwork management disciplines to meet the challenges of the information revolution would simply be overwhelmed in attempting to control the mass of complexity presented by modern computer/telecommunications technologies.

The Commission concluded that a new, broader information management framework was needed to control the Federal information appetite and help agencies more efficiently and effectively perform their information functions:

> It is time to view the problems of paperwork and red tape, not as documents to be managed, but rather as information content to be treated as a valuable resource. By applying the principles of management to this valuable national resource we not only get at the root cause of paperwork and red tape, but cause a rippling effect in the application throughout Government: the design of programs is improved; Government becomes more sensitive to the burdens it imposes on the public, becomes more understandable, and develops clearer goals and objectives. In the end, Government improves the delivery of services to people as well as fulfills its other functions of regulation, defense, enforcement and revenue collection more effectively.
>
> Information resources management is not the only solution to insensitive, complex and unresponsive Government. It can, however, make a significant impact in reducing the economic burdens of paperwork on the public by reducing duplication, clearly justifying information needs, improving reporting forms and collection processes, and effectively and efficiently utilizing modern information handling techniques and technologies.

The result of this effort was the Paperwork Reduction Act (P.L. 96–511), which was signed into law in December 1980 by the outgoing President, Jimmy Carter, and endorsed by the incoming President, Ronald Reagan.

The Act's broad purposes were to:
  Minimize the public burden of Federal paperwork;
  Minimize the Federal cost of collecting, maintaining, using, and disseminating information;
  Maximize the usefulness of information collected by the Federal Government;
  Coordinate Federal information policies and practices;
  Ensure that information technology is acquired and used to improve service delivery and program management and reduce the information processing burden for the Federal Government and those who provide information to it; and
  Ensure that the collection, maintenance, use, and dissemination of information is consistent with applicable laws relating to privacy, security, and confidentiality. These purposes remain valid to this day.

The Act strengthened the Federal Reports Act paperwork clearance process by: (1) consolidating paperwork control in OMB; (2) eliminating exemptions from review for several agencies (e.g., the

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 9]

Internal Revenue Service) and collections (e.g., recordkeeping requirements); (3) requiring agencies to eliminate duplication, minimize burden, and develop plans for using the information before they request OMB approval of proposed information collections; and (4) creating a "public protection provision" providing that no penalty may be imposed on a person who fails to respond to an unapproved paperwork requirement.

The Act's other major initiative was, as recommended by the Federal Paperwork Commission, to integrate this revitalized paperwork control process within a broader IRM context to link all of the Act's purposes under a consolidated management "umbrella." Thus, the Act created a single management framework to govern Federal agency information activities, and consolidated governmental policy and oversight functions in a new OMB Office of Information and Regulatory Affairs (OIRA).

The scope of this consolidation is seen in the array of laws enacted over the preceding 50 years that were coordinated under the Paperwork Reduction Act (PRA):

    The Federal Reports Act (1942) created the BoB/OMB paperwork clearance process—the PRA revised that process;

    The Federal Property and Administrative Services Act (1949) created the General Services Administration (GSA) and the Federal Records Act (1950) gave GSA records management and archiving functions—The PRA gave OMB oversight of those GSA functions;

    The Budget and Accounting Procedures Act (1950) gave BoB/OMB statistical policy oversight—The PRA reestablished and expanded those responsibilities;

    The Act of October 23, 1962 (P.L. 87-847, amending the Federal Property and Administrative Services Act) established the Federal Telecommunications Fund to finance procurement of Federal telecommunications equipment and facilities—the PRA gave OMB oversight of the Fund and related information technology functions;

    The Brooks Act (P.L. 89-306, amending the Federal Property and Administrative Services Act, 1965) established GSA supervision of automatic data processing equipment (ADPE) procurement and Department of Commerce responsibility for Federal information processing/ADP standards—the PRA gave OMB oversight of these functions with more detailed policy requirements; and

    The Privacy Act (1974) established OMB oversight of the management of Government records containing personal information—the PRA linked this responsibility with security and other related functions.

This range of policies and requirements consolidated under the umbrella of the Paperwork Reduction Act of 1980 demonstrates Congress' resolve to establish a comprehensive approach equal to the task of managing Government information in the emerging electronic information age. In its scope, the Act represented an historic effort to focus the attention of the entire Federal management apparatus on the twin tasks of reducing public information collection burdens and maximizing the utility of Government informa-

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 10]

tion to more efficiently and effectively perform Government functions.

### C. IMPLEMENTATION OF THE PAPERWORK REDUCTION ACT OF 1980

Despite the consensus evident in its origins, the implementation of the Paperwork Reduction Act of 1980 has received criticism from some quarters. When the Act went into effect on April 1, 1981, the newly created Office of Information and Regulatory Affairs (OIRA) operated not only under the statute, but also under President Reagan's regulatory review order (Executive Order No. 12291, issued February 17, 1981). This order created a process for OMB cost/benefit review of agency regulations, which OMB integrated with its statutory paperwork clearance process. These efforts were designed to slow the enormous growth in unjustified regulatory and paperwork burdens created during the 1970s.

With OMB taking a "unified" approach to paperwork reduction and regulatory review, implementation of the Act became a major issue in the political debate about the Administration's regulatory policy—not just involving abstract questions of administrative accountability and separation of powers, but centering on concrete Government decisions affecting public health and safety and the environment. This ultimately decade-long controversy polarized congressional oversight of OMB; diverted attention from other significant problems in OMB's implementation of the Act; and frustrated attempts to reauthorize appropriations for the Act between 1983 and 1986, and again between 1989 and 1994. Unfortunately, no constructive hearings were conducted in the late 1980s and early 1990s by the predecessor of this Committee, the Government Operations Committee, on the progress being made to reduce paperwork burdens.

The 1980 Act assigned OMB a wide range of IRM tasks, including thirteen tasks with deadlines, for its implementation of the Act's paperwork control and other IRM functions. GAO, in reviewing OMB's implementation of the Act, identified 39 discrete tasks covering the full range of OMB's responsibilities. While some were one-time actions, many were continual activities that OMB would administer as long as the Act was in place.

Responding to the paperwork burden goals included in the Act, OMB reported success in the battle against red tape—a 32 percent reduction by January 1984, which exceeded the Act's goal of a 25 percent reduction. In tracking OMB's implementation, GAO reported on several occasions that OMB was not meeting the full range of its statutory obligations. OMB did not issue policy guidance to agencies on information technology, statistical policy, records management, privacy, and information dissemination until December 1985 (OMB Circular N. A-130, December 12, 1985, 50 Federal Register 52730, December 24, 1985). The major reason, according to GAO, was OMB's concentration on paperwork clearance and the regulatory review process established by Executive Order No. 12291. GAO also found that the limited guidance was causing agencies problems in carrying out their IRM responsibilities, resulting in a serious lack of attention to a variety of information management problems. See, Hearing before the Subcomm. on Legislation and National Security, House Comm. on Government Oper-

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37
[page 11]

ations, October 21, 1981; Hearing before the Subcomm. on Federal Expenditures, Research, and Rules, Senate Comm. on Governmental Affairs, April 14, 1982; "Implementing the Paperwork Reduction Act: Some Progress, But Many Problems Remain," GAO/GGD-83-35, April 20, 1983; Hearing before the Subcomm. on Legislation and National Security, House Comm. on Government Operations, April 27, 1983; Hearing before the Subcomm. on Information Management and Regulatory Affairs, Senate Comm. on Governmental Affairs, May 6, 1983; Hearing before the Subcomm. on Information Management and Regulatory Affairs, Senate Comm. on Governmental Affairs, April 4, 1984; and "The Office of Management and Budget's Actions Show Progress in Implementing the Paperwork Reduction Act of 1980," GAO/IMTEC-84-24, September 7, 1984.

The 1986 reauthorization legislation (P.L. 99-591 (44 U.S.C. 3520(c)), 1986) contained provisions to address the paperwork versus regulatory review issue. The bill amended the 1980 Act to require disclosure of written communications between OIRA and agencies or the public regarding paperwork proposals, and OIRA explanation of paperwork clearance decisions.

Even while addressing these contentious issues, the Committee maintained its strong support for the Act's paperwork reduction provisions. The 1986 legislation established an annual five percent paperwork burden reduction goal, required agencies to provide the public with more information about paperwork proposals, required OIRA to identify initiatives to reduce paperwork burdens associated with Federal grant programs, and revised the definition of "information collection request" to include "collection of information requirement." This definitional change ensured that regulatory paperwork would be governed by all aspects of the Act's paperwork clearance process.

Finally, with regard to IRM and other information functions, the 1986 amendments required Senate confirmation of the OIRA Administrator; defined the term "information resources management"; provided new requirements and deadlines for IRM plans and policies; required the appointment of a professional statistician to carry out a broadened array of OMB's statistical policy functions; revised the scope of the Act's information technology provisions; strengthened OMB responsibilities for information security and dissemination; and mandated steps to make Government information more accessible to the public.

Notwithstanding the improvements made by the 1986 legislation and the successful efforts of the Reagan Administration to reduce the growth rate of paperwork and regulatory burdens, criticisms continued about the use of paperwork clearance as an adjunct to regulatory review, about OMB's still-lagging progress in implementing the IRM provisions of the Act, and about OMB's failure to stem the still-growing tide of paperwork. Expiration of the Act's second authorization for appropriations in 1989, and the Committee's consideration of reauthorization legislation provided the forum once again for this debate.

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 12]

### D. THIRD PARTY DISCLOSURE

In 1990, the paperwork/regulatory issues, particularly, took on more urgency when the Supreme Court ruled in *Dole* v. *United Steelworkers of America*, 49 U.S. 26 (1990), on the scope of the paperwork clearance process.

*Dole* involed an OIRA paperwork clearance disapproval of several provisions in the OSHA Hazard Communication Standard, which requires employers to inform employees of hazardous chemicals in the workplace. After lengthy litigation over the OSHA rule and OIRA's role in its promulgation, the Supreme Court ruled that OIRA's authority to review agency information collection activities was limited to information collected by an agency, and did not extend to third-party information disclosure requirements. The Court's discussion of limits on OMB's ability to affect an agency's "substantive regulatory choice" was seized on by OMB critics as vindication of their decade-long argument that OMB was overstepping its legal mandates. On the other side of the argument were those who claimed that agencies were now using *Dole* to justify sending fewer proposals to OIRA for clearance.

The Committee believes that the Court misreads Congress' intent in enacting the 1980 Act. H.R. 830 overturns the *Dole* decision and includes third party disclosure requirements within its provisions.

The basic reasons to ensure that third party disclosure requirements are clearly within the scope of the Act are threefold. The character of Federal information collection has changed since 1980. Increasingly, Federal agencies are using third party disclosure requirements to meet program needs, instead of directly collecting, processing, and disseminating information itself. Third party disclosures include Federal requirements for labeling, self-certification, public recordkeeping, conveying information between third parties (such as pension data a Federal agency requires employers give their employees); and directly conveying information to State or local governments.

Third party disclosure is increasing partly because agencies, with their own limited resources to collect and analyze information, have discovered that their program objectives may be met by requiring private parties to provide information directly to the intended beneficiary (e.g., an employee of the employer) or enforcer (e.g., the State or local government charged with regulatory enforcement), eliminating the Federal middle-man. In order to decrease the direct cost of Government services, agencies may also adopt third party disclosure in the form of self-certification and recordkeeping by private entities to replace extensive information collections.

In addition, the Federal Government has increased the use of third party disclosure by having private institutions and individuals report to State or local governments. States, for example, are often charged with the responsibility for implementing and enforcing Federal program requirements with extensive information collection. In such situations, a Federal agency may not actually receive the information as collected, but require the States to retain the reports from the public for possible Federal inspection or hav-

1:06-c... ...JAG   ... ...

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 13]

ing States send the Federal agency only a summary of information reported to them.

### E. PRESIDENT BUSH'S COUNCIL ON COMPETITIVENESS

The lack of Congressional support for reauthorizing the Paperwork Reduction Act during the late 1980s and early 1990s resulted in a debilitated OIRA. The Agency suffered from a reducing budget and a lack of political level leadership. The vacuum that was created was largely filled during the administration of President George Bush by the creation of the Council on Competitiveness. The Council was a Cabinet-level body, chaired by Vice President Dan Quayle, and designed to reduce the burdens of excessive regulation and to encourage America's competitiveness.

In a September, 1992 report entitled, "The Legacy of Regulatory Reform: Restoring America's Competitiveness," the council detailed its success in making the regulatory process more efficient and effective.

Some of the report's highlights include:

> The Bush/Quayle Administration's reforms to the drug approval process save lives and reduce suffering for millions of U.S. citizens. Experts estimate that more than 33,000 lives will be save annually in the U.S. The Council's reforms will cut, nearly in half, the time necessary to approve important new drugs to treat cancer, heart disease, Alzheimer's depression, cystic fibrosis, AIDS and other life-threatening diseases. The 76,000 AIDS/HIV patients in the United States can be helped by our rapid approval process.
>
> Health care has benefited from U.S. world leadership in biotechnology that has created more than 750 new drugs, vaccines and devices to address diseases, such as cancer and AIDS. The Council's efforts have supported the development of the U.S. biotechnology industry. This rapid growth section employ approximately 80,000 Americans nationwide.
>
> The Bush Administration's regulatory reform efforts have generated and saved jobs for workers in the U.S. Economists estimate that a regulatory reduction of this magnitude will save or create over 200,000 jobs nationwide. By cutting regulatory red tape, the Bush/Quayle Administration has freed up resources for productive, job-creating uses. These efforts have and will continue to touch the lives of the citizens of the United States.
>
> The Bush/Quayle Administration opposed efforts to expand harmful fuel efficiency (CAFE) regulations that create incentives for American companies to relocate automobile and auto parts manufacturing overseas. Raising the CAFE standard merely 2 mpg would cost over 200,000 jobs nationwide. A much higher CAFE standard, such as the proposed 40 mpg level, would cripple the U.S. automobile industry and threaten some 2.1 million auto-related jobs in America.
>
> The Council on Competitiveness' Report on National Biotechnology Policy sets forth a common sense approach to biotechnological innovations in agriculture. Biotechnology offers the prospect of higher crop yields, reduced pesticide use, improved nutritional characteristics, and healthier crops for

176

## PAPERWORK REDUCTION ACT
P.L. 104-13

[page 14]

America's 2 million farms. By employing risk-based regulation, this industry will safely grow to $50 billion nationwide by the year 2000, with substantial benefits to American workers and consumers.

Many of the Bush Administration's legal reforms incorporated market-style incentives to reduce litigation and encourage earlier dispute resolution. The Council on Competitiveness has worked to implement reforms, which would promote fairness and predictability in our nations court system. With 18 million new civil cases filed in the United States last year, the time has come for someone to stand up to the litigation explosion. The Council on Competitiveness is the voice in Government leading the charge.

Lack of clarity over Superfund liability drove many of America's 35,000 lending institutions to become very reluctant in lending to American businesses. The Council on Competitiveness has worked with EPA to clarify lender liability obligations under superfund, and thereby improve the lending climate for American businesses.

The Administration has put in place environmental programs that are affordable and effective, and preserve jobs. The Bush/Quayle Administration coordinated implementation of the new Clean Air Act that improves the quality of the environment in the United States:

> Reduces sulphur dioxide emissions in the year 2000 by 10 million tons less than they would have been otherwise.
>
> Reduces cancer-causing hazardous air pollutants by 27 million pounds approximately four years ahead of schedule.
>
> Reformulates gasoline to make it less polluting by reducing the emissions of ozone depleting and cancer-causing chemicals.

Small businesses generate most of the new jobs in America. Excessive regulation litigation costs are often serving as the greatest barriers to new small businesses. The Council on Competitiveness has worked with the Securities and Exchange Commission to make it easier for America's small businesses to access capital markets directly. For the first time, thousands of small businesses will be able to use streamlined securities registration forms. It is estimated that eligible businesses will save up to $180 million in legal and accounting fees.

Despite these successes, not everybody was pleased. According to the November 11, 1991 edition of Insight magazine:

> The council's power to drag out and review the regulatory process at every step along the way has infuriated members of Congress and other advocates of regulations it has helped to quash. Public interest and environmental groups denounce it as a deregulatory star chamber.
>
> In a September report, "All the Vice President's Men: How the Quayle Council Secretly Undermines Health, Safety and Environmental Regulations," two pro-regulatory groups, OMB Watch and Public Citizen's Congress Watch, decried the "stranglehold on the agency rule-

177

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 15]

making process" enjoyed by the little-known but "formidable" President's Council on Competitiveness.

The Council was eliminated in early 1993 following the inauguration of President William J. Clinton.

### F. 1995 REAUTHORIZATION

Reauthorization efforts in the current 104th Congress began in the final days of the 103rd Congress. During that Congress, Congressmen Norman Sisisky (D–VA) and then Government Operations Committee ranking minority member William F. Clinger, Jr., (R–VA), introduced H.R. 2995, a bill to reauthorize the Paperwork Reduction Act. This bill gained almost immediately over 120 cosponsors with an almost equal number of Republicans as Democrats. A Senate companion bill, S. 560 was introduced by Senators Sam Nunn (D–GA), Dale Bumpers D–AK) and William Roth (R–DE). A similar bill, S. 681, was introduced by Senators John Glenn (D–OH), and Carl Levin (D–MI). Discussions among the primary sponsors of the two Senate bills, and with officials of the Clinton Administration, suggested that a renewed cooperative effort could produce a single compromise bill.

A compromise bill was drafted in the Senate, and later supported in the House by Congressmen Clinger and Sisisky. It was approved by the Senate Committee on Governmental Affairs on August 2, 1994, and later passed the full Senate with unanimous support. In a joint letter on August 3, 1994, Congressmen Clinger and Sisisky wrote Government Operations Committee Chairman John Conyers (D–MI) seeking Committee consideration of the Senate bill. In their letter, they stated,

> S. 560, as amended by a substitute offered by Sen. John Glenn, is a logical extension of legislation first championed by the Government Operations Committee a decade and a half ago. This new bill builds on the Paperwork Reduction Act of 1980 by significantly improving the management of information technology and information resources in the federal government.
>
> We are writing to ask that you join us in support of this effort. We also understand the Clinton Administration's Office of Management and Budget, the General Accounting Office, and the small business community have all expressed their support for S.560, as amended.

Unfortunately, the Committee took no action and the Senate's compromise proposal failed to clear the Congress during the 103rd Congress. The amended S. 560 became the base vehicle for consideration in both the House and the Senate during the 104th Congress, however, and is represented in many of the pages of the bill approved by the Committee on Government Reform and Oversight.

Following review of the Act's implementation, reports from OMB, GAO and others, and consideration of the varied public views, the Committee is convinced that the basic purposes of the Act and the management framework it set in place in 1980 are still appropriate and should be continued. However, too little progress has been made in implementing key provisions of the Act. Amendments are required to strengthen each functional IRM area: IRM policy; pa-

178

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 16]

perwork control; dissemination; statistics; records management; security and privacy; and information technology management.

First, with regard to the reduction of paperwork burdens, more needs to be done. Specific annual paperwork reduction goals will help focus agency attention on this important task. If these goals are not reached, OMB should recommend to Congress statutory changes to programs designed to meet the full 10 percent burden reduction goals. More precise agency requirements, including public comment, will lead to early agency review of information collection activities before submission to OMB. Finally, the disparate treatment of information disclosure and collection requirements, introduced by *Dole*, should be ended.

The Act's IRM provisions are also in need of revision for a variety of reasons, not the least of which is the use of new information technology. Over the past 13 years, OIRA failed to carry out its IRM responsibilities as well as it could. Similarly, Federal agencies made limited progress in implementing efficient and effective programs of information resources management. As a result, many of the problems the Act sought to remedy not only persist, but have grown more serious. Additionally, a revised Act should also help agencies prepare for the variety of new information management challenges that are on the horizon.

Overall, the Committee believes, as did the Federal Paperwork Commission, that more needs to be done to improve the management of Federal information resources. Information policymakers must equip themselves with the knowledge necessary to achieve the highest quality, best use, and least burden from Government information. Similarly, agency managers, called upon to do more with less, must familiarize themselves with the capabilities of information technology as a resource for efficiently and effectively administering programs—again, maximizing utility and minizing burden. Without this effort, Government information activities will be too wasteful and too burdensome, and the American public will have their worst views of Government information confirmed.

To achieve this goal, the Committee believes that Government information, as a valuable and useful resource to Government and society, must be managed in a coordinated and systematic manner based on established principles of information resources management. OIRA, in conjunction with other central management offices, should exercise leadership in developing coherent information policy which gives balanced and needed emphasis to all information functions. Federal agencies should establish information resources management programs that implement OIRA's policy guidance. Without such programs, agencies will fail in their operational responsibilities—OIRA may develop the policies but the practices take place in the agencies.

The Committee is pleased to see a variety of initiatives to change the culture of Federal information resources management by focusing on "best practices" and the improvement of mission performance. See, GAO's report, "Improving Mission Performance Through Strategic Information Management and Technology" (GAO/AIMD-94-115, May 1994); the revised OMB Circular A-130, 59 Fed. Reg. 37906 (July 25, 1994); and "Reengineering through Information Technology," Accompanying Report of the National Performance

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37
[page 17]

Review (September 1993). These efforts hold great promise for improving the efficiency and effectiveness of Government information activities.

The major functional areas addressed by the legislation are as follows:

*Information resources management*

The Paperwork Reduction Act of 1980 established the concept of information resources management (IRM) for the Federal Government. The Act calls for the efficient and effective management of information and related resources, like other Government resources. The management structure required by the Act—a central office in OMB and designated IRM officials in the agencies—was intended to insure that agency IRM activities be given more visibility and attention from top management.

Managers in most agencies continue to overlook the importance of their information management activities. In many Government agencies, information issues are viewed as an administrative function, rather than an integral part of agency management and operations. As a result, these issues and functions often are delegated to technical staff. Consequently, during the 14-year period the law has been in effect, most agencies have made little progress in improving the management of their information resources, particularly with regard to their supporting the fulfillment of agency programs and missions.

Furthermore, within the past decade, the public has grown accustomed to the benefits of using information technology to improve the cost, quality, and timeliness in the delivery of services and products. Americans now expect to solve a problem with one telephone call, obtain customer service 24 hours a day, withdraw cash from automated teller machines around the country, and get products delivered almost anywhere overnight. Consequently, at a time when almost anyone can get eyeglasses in about an hour, veterans cannot fathom why they must wait six weeks to obtain them from the Government. Similarly, the general public cannot understand why it takes weeks, instead of days, to process an income tax refund or months to determine eligibility for Social Security disability benefits.

Federal agencies are estimated to have spent at least $25 billion on information systems in fiscal year 1994, and about a quarter of a trillion dollars since the Paperwork Reduction Act was enacted 14 years ago. Despite this huge expenditure, it is unclear what the public has received for its money. Critical information assets are frequently inaccurate, inaccessible, or nonexistent. Efforts across the Government to improve mission performance and reduce costs are still too often limited by the lack of information or the poor use of information technology.

The General Accounting Office's reports on information management and technology issues of 1988 and 1992 underscored how federal agencies often lack the critical information needed to analyze programmatic issues, control costs, and measure results. (See "Information Management and Technology Issues," GAO/OCG-93-5TR, December 1992; "Information Technology Issues," GAO/OCG-89-6TR, November 1988).

180

## PAPERWORK REDUCTION ACT
P.L. 104-13

[page 18]

Further, GAO has documented examples of Federal agency information systems failures over the past 10 years that include:

Over $1 billion of mistaken Medicare payments;

The outlay of millions of dollars of unauthorized student loans because of poor information tracking;

Inadequate financial data on agencies' basic operations that frustrates financial management and auditing; and

The release of highly sensitive data on law enforcement informants through mismanagement of security.

For most Federal agencies, GAO has reported that pervasive gaps in available skills and confused roles and responsibilities severely inhibit significant increases in performance. Common problems include:

(1) A failure to define the roles of program managers in relation to IRM professionals;

(2) The lack of an effective IRM official to raise and help resolve information management issues with top management; and

(3) Outdated or poorly defined skill requirements.

These problems weaken an agency's ability to define how new information systems support its missions, meet customer needs, or respond more quickly to change

Without action by Federal executives, the gap between expectations held by the public and agency performance will continue to expand. Program failures will continue and opportunities for improvement will be lost. Many low-value, high-risk information systems projects will continue to be pursued unimpeded and undermanaged as leaders blindly respond to crises by purchasing more and more technology and throwing it at their problems. Most Federal managers will continue to operate without the financial information and other management information they need to truly improve mission performance. Moreover, many Federal employees will struggle unsuccessfully, under increasing workloads, to do their jobs better as they are hampered with using information systems that simply add on another automated layer of bureaucracy.

Given these risks and the vast potential for improvement, business as usual is simply no longer a tenable option for Federal executives and Government agencies. Recommendations of the President's National Performance Review (NPR) suggest the scale of improvements possible from "reinventing" the management of information technology. One such initiative, the Wage Reporting Simplification Project, identified life cycle savings of $1.7 billion to participating Government agencies and $13.5 billion in reduced burden to private sector employers (See "Engineering through Information Technology," Accompanying Report of the National Performance Review, September 1993).

The specific performance planning and reporting requirements of the Government Performance and Results Act (P.L. 103-62) point to a time when agency managers, in the very near future, will have to account for the programmatic outcomes of their information activities.

Given this need for action, the overarching management strategy of the Paperwork Reduction Act of 1980 is all the more important. As stated in the legislative history of the Act in 1980, the purpose

181

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 104-37
[page 19]

of aggregating these information resources management functions within OMB's Office of Information and Regulatory Affairs (OIRA) was to establish a government wide policy framework for "information resources management." Application of the policy framework was expected to result in considerable financial savings to the Government and a substantial reduction in paperwork burden imposed by Federal agencies on the public.

Through the Paperwork Reduction Act, the Congress attempted to articulate the management concept that could drive real world management improvements. Nearly a decade and a half later, the Committee finds that, while IRM is a recognized concept in Government and the private sector, there is not enough commitment to making IRM work in practice. The Committee is convinced, however, that the management concept is not flawed. Rather the need is to develop an improved strategy by which to apply IRM.

Information, as a resource, is not simply a matter of questions answered or systems acquired. Information must be reliable, accurate, complete, accessible, and timely if it is to be used by agency managers to make decisions and take actions in fulfilling agency missions. Accordingly, investments in information resources must be managed as a part of a coordinated, performance-oriented approach to "recognize and address the interconnectivity among the stages of the information life cycle." (See "Information Life Cycle: Its Place in the Management of U.S. Government Information Resources," Government Information Quarterly, Peter Hernon, Vol. 11, No. 2, pp. 156–7, 1994).

Part of a revised IRM strategy is to implement more fully the Act's original IRM management structure. The 1980 Act required agency heads to designate a senior IRM official, reporting directly to the agency head, who would be responsible and accountable for the agency's IRM activities. The goal was to consolidate responsibility for the functional IRM activities (collection of information, statistics, privacy and security, records management, and information technology) already established through various laws.

The Act's IRM structure at OMB and in each agency was to establish an identifiable line of accountability for IRM activities between the OMB Director and individual agencies and within the agencies. Not only would this structure enable agencies to better manage their information resources, but it would also enable the Congress to pinpoint responsibility for those activities.

In most agencies, the IRM official designated by the agency head under the Paperwork Reduction Act was (and is) the Assistant Secretary for Administration (or similar official). In addition to the IRM functions, this official also had/has a variety of other functions, such as procurement, payroll, human resources management, and space management. The common result was that these functions took precedence over the (newly coordinated) IRM responsibilities. This meant that, instead of getting greater attention and visibility for the IRM functions, subordinate officials continued to manage IRM activities, as before.

Investments in information technology also continued to be managed as before—as isolated projects not evaluated or coordinated to assure compatibility among systems. Further, they were not compared against each other and ranked in terms of priority given