1:06-cv-00519 MMM JAG   _   Page 21 of 25

# PAPERWORK REDUCTION ACT

P.L. 104–13

[page 20]

their expected support for the accomplishment of agency programs and missions.

Moreover, as a subordinate staff function, IRM was not considered important enough to integrate with other management activities, such as strategic planning, budgeting, financial management, and personnel management. Diminished in importance organizationally, IRM also suffered from the failure to develop clear job descriptions and training programs for IRM personnel. This reduced opportunities for professional advancement and IRM skill development and further reduced agency IRM capacity.

Given the weakness of agency IRM efforts, the failure of OMB to provide effective IRM guidance was all the more significant. Given this history, the Committee amends the Act in order to clarify the meaning and requirements for IRM both within OIRA and the agencies. First, IRM is redefined in H.R. 830 to link management directly with program outcomes:

> The term "information resources management" means the process of managing information resources to accomplish agency missions and to improve agency performance, including the reduction of information collection burdens on the public.

Focusing IRM on supporting mission accomplishment shifts the term from the generic concept of efficiency and effectiveness to one of direct support for the accomplishment of agency missions. This is consistent with the Committee's development of the Government Performance and Results Act, which requires agencies to develop strategic plans, and performance plans and reports, to focus program and management activities on directly serving programmatic outcomes.

H.R. 830 maintains OMB's central IRM role. The OIRA Administrator should still prescribe governmentwide IRM policies and guidance (with support from other central management agencies), oversee agency implementation, and evaluate agency IRM activities. However, the current legislation revises many of these mandates to refocus them on integrating information management with program management and concentrating on program outcomes as the standard for oversight of the efficiency and effectiveness of IRM.

Likewise, H.R. 830 also revises agency IRM responsibilities. It spells out the Act's functional IRM areas (paperwork control, dissemination, etc.) as agency operational responsibilities (in section 3506) to match OMB's policy and oversight responsibilities (in section 3504). Accountability for carrying out these responsibilities also is more clearly spelled out. Under the leadership and direct responsibility of the agency head, H.R. 830 first assigns program officials the responsibility and accountability for information resources assigned to and supporting their programs, and, second, assigns IRM oversight within the agency to the IRM office.

The connection and collaboration among program, information, and agency managers is then institutionalized by the requirement that each agency establish a process for maximizing the value and assessing and managing the risks of major information systems initiatives. Further, the process is to be used to select, control, and evaluate the results of these initiatives and assure that decisions

1:06-...-00556-...-... Page 2 of 48

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37
[page 21]

regarding these initiatives are integrated with budget, financial, and program management decisions.

Neither the functional responsibilities nor the management accountability are new creations under this legislation. The 1980 Act, as well as other related information management laws, vest these duties in the agencies. The amendments proposed in the current legislation are intended to more clearly focus agency managers on the breadth of their IRM responsibilities.

As a guide to the implementation of these requirements, the Committee believes that OMB and the agencies should draw on the developing body of GAO work or IRM "best practices". (See "Executive Guide: Improving Mission Performance Through Strategic Information Management and Technology," GAO/AIMD-94-115, May 1994.) GAO's best practices, which were identified at leading public and private organizations, center on three key efforts to build a modern information resources management infrastructure: (1) deciding to change information resources management practices and getting management commitment, (2) directing resources toward high-value uses and mission goals, and (3) supporting improvement with resources, organizational support, and trained and committed managers and professional staff. A description of these practices and recommendations for senior executives are contained in the appendix to this report.

Based on the findings of the report and other work by GAO, Gene Dodaro, Assistant Comptroller General for Accounting and Information Management, GAO, testified before the Subcommittee on National Economic Growth, Natural Resources, and Regulatory Affairs, on February 7, 1995. In his testimony, Mr. Dodaro made the following key points:

The Paperwork Reduction Act is a vital component of an overall legislative framework—including the Chief Financial Officer Act, the Government Performance and Results Act, and the Federal Acquisition Streamlining Act—designed to resolve basic management problems that undermine effective implementation of many Government programs.

The public environment has changed dramatically in the 14 years since initial passage of the Act. Rapid changes in information technology and management techniques have greatly increased the act's potential to help streamline operations and produce higher quality services delivered more effectively, faster, and at lower cost. These developments make it essential to update the act and place it within the context of the information age of the 1990s and beyond.

Despite the urgency to change, little meaningful progress towards improving Government productivity, mission performance results, and service delivery can be achieved unless federal agencies adopt sound strategic information management approaches. The improvements to the Act can help construct a useful framework to bring modern technology management approaches to the Federal Government.

*Collection of information/control of paperwork*

The Paperwork Reduction Act of 1980 authorized OMB to judge whether agency information collection activities are "necessary for

## PAPERWORK REDUCTION ACT

P.L. 104–13

[page 22]

the proper performance of the functions of the agency." In 1994, the Committee looks back over the record of the Act's implementation and finds that the Act's paperwork clearance process has served as an effective mechanism to control Federal agency information collection activities.

The effectiveness of the process as a control mechanism, however, has neither provided a reduction of the total paperwork burden, nor has it been used consistently by OMB as the Committee intended. Therefore, the Committee believes that a strengthened process, with clarified agency responsibilities and improved opportunities for public participation, will result in more significant reductions in paperwork burdens and more faithful implementation of the Act.

First, despite the Act's mandate, Government paperwork burdens on the public continue to be a real and serious problem. At Congressional hearings, representatives of the business community have testified about rising paperwork burdens. In 1989, Mark Richardson of the Business Council on the Reduction of Paperwork stated that the cost of the paperwork burden to the business sector had reached a level more than three times what it was in 1978, "about $330 billion annually." Senate Hrg. 101–166, p. 81. During the February 7, 1995, Committee hearing, Robert Coakley of the Council on Regulatory and Information Management suggested that the amount of time and effort for the public to meet the Federal Government's information needs has reached an amount equivalent to nine percent of the Gross Domestic Product.

My organization C–RIM, estimates that an amount of time and effort equal to 9 percent of the Gross Domestic Product is dedicated to meeting the Federal Government's information needs. That is a ballpark figure of what the off-budget cost of Federal paperwork requirements—the "hidden taxes" of Government programs—amounts to.

Here is how we reach that number. The Government's own estimate of the hours it takes the public to collect information, report, keep the records, fill out the forms, and answer all the questions that accompany the delivery of federally sponsored services is compiled for the annual Information Collection Budget. The fiscal 1991 estimate (the last annual estimate reflected in an Annual Report by the Office of Information and Regulatory Affairs) is 6.5 billion hours. Eighty-three percent of that is associated with the Treasury Department.

Treasury's large share is due to an adjustment made by the IRS in the late 1980's when an IRS commissioned 5-year study by Arthur D. Little indicated that the IRS previously had under-estimated the burden of its reporting and recordkeeping requirements by a factor of 7. It adjusted its burden figures accordingly. The rest of the Government did not.

Take the remaining 17 percent, adjust it conservatively by a factor of 4 instead of 7, and the total burden hour number comes to 10.2 billion hours.

. Time is money. At 50 dollars an hour—a reasonable estimate of the average cost of an hour spent for meeting Fed-

185

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37

[page 23]

eral reporting or recordkeeping requirements—the cost of the federal paperwork burden comes to 510 billion dollars, which approximates 9 percent of the 1992 Gross Domestic Product.

In the first years of the Act's implementation, OMB's annual reduction figures had suggested great progress in reducing these paperwork burdens (e.g., 12.8 percent in 1982 and 10 percent in 1983). within several years, however, the paperwork problem proved to be more intractable. OMB's governmentwide burden estimate increased each year, despite the reductions associated with specific year-to-year disapprovals. According to GAO, there was "a 27-percent increase in reported burden hours (to 1.9 billion) between 1980 and 1987." "Paperwork Reduction: Little Real Burden Change in Recent Years," GAO/PEMD-89-19FS, June 1989.

New information collections necessitated by new laws and regulations accounted for some of this increase. Other increases were due to agency reevaluation of existing burdens. Thus, GAO pointed out in 1993 that while the paperwork burden OMB reported rose from over 1.8 billion hours in 1987 to nearly 6.6 billion hours in 1992, most of the increase was due to a recalculation of burden hours by the Department of the Treasury, not because of new burdens imposed on the public. "Paperwork Reduction: Reported Burden Hour Increases Reflect New Estimates, Not Actual Change," GAO/PEMD-94-3, December 1993. On the basis of such factors, as well as other methodological problems, GAO has cautioned against singular reliance on such estimates. While the Committee acknowledges these limitations, the Committee believes that burden estimates serve an invaluable role as markers along the road to paperwork reduction.

Particularly for small businesses, paperwork burdens can force the redirection of resources away from business activities that might otherwise lead to new and better products and services, and to more and better jobs. Accordingly, the Federal Government owes the public an ongoing commitment to scrutinize its information requirements to ensure the imposition of only those necessary for the proper performance of an agency's functions. Burden estimates and reduction goals can help OMB and agencies target particularly burdensome paperwork and focus agency efforts on achieving meaningful burden reductions. The Committee thus increases the Act's five percent annual burden reduction goal to ten percent and stresses the need for OMB to oversee improved burden estimation efforts. The Committee's only caution is that OMB and agencies not rely solely on burden estimates apart from a qualitative assessment of the necessity of any information collection for the proper performance of an agency's functions.

It is because of the Committee's commitment to the goals of the 1980 Act, however, that the current legislation overturns *Dole* v. *United Steelworkers of America*, the Supreme Court's 1990 decision that the Paperwork Reduction Act's paperwork clearance process for agency information "collections" does not cover agency information "disclosure" requirements. The need for a comprehensive and conclusive process for the review of agency information activities that burden the public requires the Committee to amend the Act to clearly overturn the Supreme Court decision. The IRM mandate

186

## PAPERWORK REDUCTION ACT
P.L. 104–13

[page 24]

of the Act does focus on internal government operations, but to the extent Government information activities affect the public, associated burdens must be evaluated, justified, and reduced as provided under the Act. In this way, overturning the court decision is also consistent with the original intent of the 1980 Act to eliminate exemptions from paperwork clearance.

Moreover, it became clear shortly after the Court's decision that agencies would use the decision to avoid OMB review. In a report prepared for Congress, GAO found that neither OMB nor the agencies it reviewed had issued any formal guidance implementing the decision. Further, agencies differed in their interpretation of the decision. Two agencies studied by GAO had not changed their practices (i.e., EPA and HHS). Two other agencies, however, were sending fewer proposals to OMB for clearance (i.e., OSHA and the FTC). "Paperwork Reduction: Agency Responses to Recent Court Decisions," GAO/PEMD–93–5, February 3, 1993. The solution now is to end the disparate treatment of collections of information made by Federal agencies and third-party paperwork burdens imposed on one party by another party at the direction of a Federal agency.

The current legislation also strengthens OMB accountability, as well as its paperwork reduction mandate. Committed to a comprehensive process, but mindful of past controversies, the Committee believes that a more thorough and open agency paperwork clearance process can improve the quality of paperwork reviews and public confidence in Government decision-making. Analogous to the way in which an agency's rulemaking record stands as the basis for and evidence of the need for a regulation, so should a more highly developed and examined record of an agency's formulation of an information collection proposal stand as the basis for the collection and as a public record of its need.

The delineation of a more detailed agency paperwork clearance process obviously places a heavier burden on agencies to justify the programmatic need for information. But this, too, should help counteract some of the negative connotations associated with information collections. Information requirements will less often come unannounced and unexplained if the agency has already had to justify the requirement, and the burden it imposes, to the public and consider public comments. This early review in turn should help agencies make their case for the value of Federal information and prompt them to improve the quality and availability of such information. The review certainly will assist individuals and organizations representing those who are burdened to engage agencies in meaningful dialogue about the need for information. Out of this more thorough review of information collection proposals should come more effective ways to minimize burdens and maximize the utility of information collected or generated by or for the Federal Government. As agencies move to more electronic information systems, this type of clearance process provides greater assurances that both information collection and technology investments are made wisely.

H.R. 830, as amended, seeks to improve the law to more clearly address the benefits as well as the burdens of Federal information. Accurate, timely, relevant, statistically sound information is essential to rational and effective legislation, regulation, resource alloca-

187

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37

[page 25]

tion, and enforcement—indeed, for virtually all public policy decisions. Thus, the bill, seeking to "ensure the greatest possible public benefit" form Government information, states that it is a basic obligation of the agencies and OMB to "improve information resources management in ways that increase productivity, efficiency, and effectiveness of Federal programs, including service to the public." Better IRM will create better information, used better, and with fewer burdens on the American public. For example, the bill maximizes utility by placing an emphasis on interoperability of agency systems and improvements in data sharing. These steps are meant to capitalize on the advantages that information technologies offer for streamlining agency operations, enhancing public access to Government information, and reducing burdens on the public.

To accomplish these various objectives, H.R. 830, as amended, makes extensive changes to the existing law regarding the controls over information collections. At the OMB level, the legislation requires the Director, in consultation with the agency heads, to set an annual governmentwide goal for the reduction of information collection burdens by at least ten percent and to set annual agency goals for burden reduction, as well—importantly, not merely as a stand-alone goal, but as a part of a broader IRM plan, including efforts to reduce burden, eliminate duplication, meet shared data needs, and improve efficient and effective use of information technology. In addition, the bill calls on OIRA to coordinate its review of procurement and acquisition-related collections of information—one of the most frequently mentioned areas of burden—with OMB's Office of Federal Procurement Policy (OFPP) to improve the efficiency and effectiveness of the procurement process as well as to reduce burdens on the public.

At the agency level, the bill describes in some detail the requirements for agencies to establish processes for reviewing their information collections before submitting them to OMB for clearance. The agency's designated IRM official should, independently of the proposing program office, evaluate the need for the information, the burden estimate, the agency's plans for management and use of the information to be collected, and whether the proposed collection meets the other requirements of the Act. H.R. 830, as amended, also prescribes that agencies must consult with the public on their proposed collections and certify to OMB that the clearance steps have been taken. These include assuring the need for the information, that the collection is not unnecessarily duplicative of information otherwise reasonably accessible to the agency, and that the burden to be imposed has been minimized.

Under the legislation, OMB must then allow at least 30 days for further public comments. Also, OMB is to provide a decision to the requesting agency within 60 days (the 30-day extension period under current law is eliminated). If OMB does not notify the agency of its decision on the proposed collection within this time, approval is inferred and the agency may collect the information for two years. Any such OMB decision to disapprove a collection of information or instruct an agency to make substantive or material change to its is to be publicly available and include an explanation of the OMB decision. Further, communications between the OIRA Administrator, or OIRA staff and an agency or person not em-

188

PAPERWORK REDUCTION ACT
P.L. 104–13
[page 26]

ployed by the Federal Government regarding proposed collections
of information are to be made part of the public record. Public com-
ments pertinent to OIRA's decision to approve, modify, or dis-
approve an agency's collection of information are to be part of the
public record.

Finally, an additional new purpose of the bill is to strengthen the
partnership between the Federal Government and State, local, and
tribal governments by minimizing information collection burdens
and maximizing utility of information collected by Federal agen-
cies. This will require additional attention be paid to establishing
common standards for data exchange and for interoperatability
among systems.

In these various ways, and as more precisely described in the
section-by-section analysis, the Committee intends to strengthen
the Act's paperwork reduction requirements to improve the effi-
ciency and effectiveness of Government operations, including the
reduction of paperwork burdens on the public.

*Information dissemination*

Information dissemination is an integral part of the information
life cycle. While only mentioned once in the 1980 Act, the 1986
amendments properly inserted references to dissemination in provi-
sions on IRM, IRM planning, and OMB's functional authority. In
the years since the last reauthorization, dissemination has emerged
as a particularly important functional information area due to new
opportunities for improved dissemination of and public access to
Government information made possible by emerging information
technologies, not the least of which are growing public networks.

To realize the full potential for the flow of information, particu-
larly electronically, requires new efforts by the Federal Govern-
ment to coordinate and improve dissemination management poli-
cies and practices. For these reasons, and as described below, the
Committee believes it is very important to provide a more detailed
set of dissemination policies in statute.

The delineation of detailed dissemination policies and principles
is also recommended because of the record of OMB's role in agency
dissemination activities over the past 13 years. In the early 1980s,
OMB used longstanding management powers to mandate the elimi-
nation and consolidation of thousands of agency publications as
part of the Reagan Administration's "war on waste." While savings
were undoubtedly realized, the elimination of many public service
publications and the restrictions on agency dissemination planning
were criticized. In addition, subsequent OMB policy guidance fur-
ther limited agency dissemination activities by subordinating Gov-
ernment dissemination decisions to that of the private sector. OMB
Circular No. A–130 (December 12, 1985, 50 Fed. Reg. 52730, De-
cember 24, 1985), and OMB's "Advance Notice of Further Policy
Development on dissemination of Information," 54 Fed. Reg. 214
(January 4, 1989). While OMB proposed a more positive policy
("Second Advance Notice of Further Policy Development on Dis-
semination of Information," 54 Fed. Reg. 25554, June 15, 1989),
and ultimately finalized a policy substantially in accord with the
provisions of this legislation (revised OMB Circular No. A–130,
Transmittal No. 1, June 25, 1993, 58 Fed. Reg. 36068, July 2, 1993,

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 104–37
[page 27]

and Transmittal No. 2, June 15, 1994, 59 Fed. Reg. 37906, July 25, 1994), the record of OMB's changing dissemination policies, and the criticisms and questions that accompanied them, recommend the delineation of a consistent policy set in statute.

The legislation, therefore, provides a detailed framework to guide Federal Government dissemination of public information. Policy guidance and oversight responsibilities are vested in OMB and operational responsibilities rest with the agencies. The legislation's mandate is clear. OMB has an obligation to promote public access to Government information through the development and oversight of governmentwide information dissemination policies. Likewise, agencies have an obligation to conduct their dissemination activities to ensure that the public has timely and equitable access to public information.

The Committee intends these provisions to assist agency managers in accomplishing their missions by disseminating information necessary for the proper performance of the agency's functions. Working in consultation with the public, OMB, and other central management offices, agencies should adopt uniform technical standards and capabilities, and integrate dissemination decision-making with the management of other IRM functions to promote and provide more efficient and effective public access to a broader range of Government information.

Accordingly, the legislation's policies and required practices apply to the dissemination of all Government information regardless of form or format (i.e., paper publications, compact disc, on-line data, etc.), that public information be made available on a timely, equal and equitable basis to all persons, that a diversity of government and non-government sources be used to facilitate access to Government information, and that there be no exclusive or restrictive distribution arrangements to limit or regulate the use or reuse of public information.

These requirements are designed to facilitate information dissemination as part of the efficient and effective performance of Government functions. This imperative does not, however, provide a single method or rule for dissemination. Federal agencies must develop approaches and make specific dissemination decisions that balance among competing forces and interests. Agencies must avoid privatization of essential government public services. Yet agencies need to affirm the important role played by information providers in the private sector. Agencies also must develop effective dissemination capabilities, while avoiding proprietary-like information operations.

Thus, as agencies are governed by the public purposes of their statutory missions, they should avoid copyright-like controls (e.g., restrictions on reuse of information) or pricing arrangements that restrict the flow of public information. They should also take advantage of (and not unnecessarily duplicate) private sector initiatives that may more efficiently or effectively serve the same ends.

One critical component in establishing broad-based public access to Government information is the development of a Government Information Locator Service (GILS). Such a locator system (or system of systems) should facilitate public and agency access to Government information by providing pointers to information holdings of

PAPERWORK REDUCTION ACT
P.L. 104–13
[page 28]

Federal agencies. Ultimately, this system should become a path to the holdings themselves. However, the Committee recognizes the diversity of current agency information systems and technologies. It is important, therefore, at this time to promote access through available channels.

In the context of the current legislation and the immediate future, OMB has moved in the right direction in issuing its recent directive on GILS, and NIST likewise is making a valuable contribution to the creation of GILS standards. It is important, however, to insure consistent implementation across agencies and to create procedures and mechanisms that can be used to build a viable locator system. This includes ensuring the security and integrity of GILS. GILS also needs to be able to evolve over time to accommodate the changing mix of electronic formats for Government information and rapid advances in information technology so that it does not become obsolete. The Committee expects that the interagency committee created in the legislation will provide the advice needed to ensure security and integrity of data, compatibility, sharing among agencies, and uniform access by the public. The term "uniform" should be understood to mean establishing a consistent standard for access and does not mean that all agency systems must employ the same software and hardware.

*Statistical policy*

Between 1939 and 1977, Federal statistical policy was the responsibility of OMB/BoB (Reorganization Plan No. 1 of 1939, see also section 103 of the Budget and Accounting Procedures Act of 1950, 31 U.S.C. 1104(d)). In October 1977, it was assigned to the Department of Commerce by Executive Order No. 12013. The Paperwork Reduction Act of 1980 transferred statistical policy and coordination back to OMB, integrated it with related information functions, and attempted to strengthen OMB's oversight and coordination responsibilities. To further strengthen the administration of the statistical functions, the 1986 amendments required OMB to appoint a professional statistician to the position of Chief Statistician to carry out OIRA's statistical policy responsibilities.

H.R. 830, as amended, continues and strengthens the requirements for OMB leadership of the Federal statistical system and adds a number of new provisions. These provisions reflect the Committee's view of the importance of improving central leadership and coordination of Federal statistical programs. While there is continuing concern about the adequacy of OMB's attention to its statistical policy functions, the Committee believes that these functions would still be best served by being in OMB, as the central office with management and budget, as well as IRM, authority.

The Committee is convinced that much more needs to be done to address growing problems in the Federal statistical system. It has found that the Federal statistical system has not kept up with the changing nature of the U.S. and global economies, nor with advances in information technology. Statistical priorities and programs need to be reexamined and updated in light of rapidly changing economic, technological, and social conditions. Statistical information is used for a wide variety of decision-making, both in the public and private sectors. Having reliable, pertinent informa-

191

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104–37

[page 29]

tion therefore becomes a necessity if such decisions are to be based on valid information.

To address these concerns, H.R. 830, as amended, amplifies OMB's existing statistical policy responsibilities and includes other provisions designed to improve the Federal statistical system and information infrastructure. The Committee intends that OMB give balanced emphasis to all of its major information policy functions, including statistics. The Committee expects OMB to devote an appropriate amount of its staff resources to statistical policy development and leadership.

H.R. 830, as amended, strengthens the statistical policy mandate by explicitly requiring OMB to coordinate and provide leadership for the development of the decentralized Federal statistical system. Such coordination is needed to ensure the efficiency and effectiveness of the system as well as the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes. A study by the National Research Council ("Private Lives and Public Policies: Confidentiality and Accessibility of Government Statistics," 1994) noted increased concerns among many Americans about the confidentiality of information collected by Government surveys. The report recommended new standards and procedures be implemented by Federal agencies to preserve confidentiality. These concerns are reflected in the legislation's amendments to the Act to provide more specific mandates for OMB and agencies to protect personal privacy in the collection of information for statistical purposes.

Developing interoperability among statistical systems in the different agencies also is important for improving access to valid and current data. To facilitate this coordination, the bill requires OMB to establish an interagency council, headed by the Chief Statistician and consisting of the heads of the major statistical agencies and representatives of other statistical agencies under rotating membership. In addition, OMB is to review the budget proposals for agency statistical programs to ensure that they are consistent with governmentwide priorities for maintaining and improving the quality of Federal statistics and prepare an annual report on statistical program funding.

These provisions require that OMB adopt a proactive approach to statistical leadership. The Committee expects that OMB, and in particular the Chief Statistician, will provide leadership in identifying statistical priorities and in identifying and recommending corresponding budget priorities for Federal statistical programs. Additionally, OMB should take an active role in developing statistical standards and guidelines to assist Federal agencies in the development and implementation of statistical programs. Statistical policy must address issues related to information collection, use, and dissemination. Appropriate protection for statistical confidentiality and security for statistical systems must be an integral part of the development of these programs. OMB is also to coordinate the participation of the United States in international statistical activities, including the development of comparable statistics. In addition, OMB is to provide opportunities for training in statistical policy and coordination functions to Federal Government employees.

**PAPERWORK REDUCTION ACT**
P.L. 104-13
[page 30]

*Records management*

In order to provide greater visibility to the area of records management, the Paperwork Reduction Act assigned OIRA an oversight role to support the efforts of GSA in getting agencies to implement effective records management practices. This was the only entirely new function assigned to OMB by the 1980 Act. The need was described in a July 1980 letter from the Comptroller General:

> With regard to records management, the bill recognizes the need to provide a cohesive Federal information policy and to coordinate the various components of Federal information practices. Records management, concerned with information use and disposition, is a vital element of information policy. In the past, this function has not received the level of management attention it deserves. For example, although the General Services Administration (GSA) is authorized to do so, it does not always report to OMB or to the Congress serious weaknesses in agencies' records management programs along with the potential for savings if corrective actions are taken. We pointed this problem out as early as 1973, but in a recent study we found that GSA's actions to date have been inadequate.
>
> We believe the assignment of oversight responsibility to OMB and the periodic evaluations required by the bill would remedy the situation. In doing so, the benefits which improved records management practices can bring to the performance of Federal programs can be realized.

Records management is essential to efficient and effective management of information throughout the information life cycle. As such, its oversight continues to be properly assigned to OMB under the Act. In the new era of electronic records, it is even more important to ensure effective records management at all stages of the information life cycle. Agencies increasingly rely on electronic mail for communication, on online systems for dissemination, and on CD–ROMs for storing large volumes of data. Unless information created in these formats is properly managed to insure its integrity and archival preservation, much of the Government's record will be lost.

The current policy debate about records management in this emerging environment of networks, electronic mail, and the National Information Infrastructure demand the development of new agency policies and practices. OMB, NARA, and each operating agency must take affirmative steps to manage records, regardless of their form or format, consistent with legal requirements and the practical demands of the electronic information age. Agencies must determine how they will insure future access to Government records originating in electronic formats and need to work closely with NARA in establishing consistent standards for archiving electronic materials.

H.R. 830, as amended, reiterates the Act's mandate for OMB to provide advice and assistance to the GSA Administrator and to the Archivist and to review agency compliance with the records management requirements. Further, it charges OMB with the responsibility to oversee the application of records management policies

193

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104–37

[page 31]

and guidelines, including requirements for archiving information in electronic format, when agencies are planning and designing their information systems. Finally, as with other functional areas, the Act now explicitly spells out the role of agency records management responsibilities in the IRM framework.

The Committee also wishes to emphasize the importance of consistent records retention policies for records management functions. Clear records retention policies for all recordkeeping requirements are needed if expensive and wasteful burdens on the public, State and local governments, and Federal agencies are to be avoided.

*Privacy and security*

Maintaining privacy and security is a key element in managing information. OMB had responsibilities for privacy and security of Government information prior to enactment of the 1980 Paperwork Reduction Act, under the 1974 Privacy Act and within other statistical policy, forms clearance, and computer security functions.

H.R. 830, as amended, continues OMB's role under the Paperwork Reduction Act for developing and overseeing agency implementation of policies, standards, and guidelines for the privacy, confidentiality, security, disclosure, and sharing of information. The Act promotes sharing and disclosure of information for purposes of maximizing the utility of information to users, both governmental and non-governmental. Sharing of information among Government agencies also serves the goal of minimizing the burden imposed on the public by Government collection of information. Such sharing and disclosure must be done, however, consistent with the provisions of the Paperwork Reduction Act and other laws that govern access, confidentiality, sharing, or disclosure, such as the Privacy Act, the Computer Matching and Privacy Protection Act, the Freedom of Information Act, and agency specific laws such as those governing the Internal Revenue Service and the Census Bureau.

As a practical matter, the growth of networks offer new opportunities for broadly sharing information among agencies and with the public. At the same time, they create new vulnerabilities that can lead to breaches in security and threats to the loss of privacy. An assessment by the National Research Council ("Computers at Risk: Safe Computers in the Information Age," (1991)) predicted that without more responsible use and management of computer systems, disruptions with adverse consequences would increase. The Committee is concerned about these increasing incidents of security breaches that range from hackers breaking into DOD computers ("Computer Security: Hackers Penetrate DOD Computer Systems," GAO/T–IMTEC–92–5, November 20, 1991), to IRS employees browsing through personal income records ("IRS Automation: Controlling Electronic Filing Fraud and Improper Access to Taxpayer Data," GAO/T–AIMD/GGD–94–183, July 19, 1994, and "IRS Information Systems: Weaknesses Increase Risk of Fraud and Impair Reliability of Management Information," GAO/AIMD–93–34, September 22, 1993). Agencies must take the necessary steps to maintain the appropriate balance between openness and security, and give new attention to the risks of maintaining information in electronic formats.

194

# PAPERWORK REDUCTION ACT
P.L. 104-13
[page 32]

The bill also recognizes the enactment of the Computer Security Act in 1987, establishing that OMB require Federal agencies to identify the sensitivity of their information and to afford appropriate security protections for it. Not only must systems be secured to maintain confidentiality of sensitive data, but procedures must ensure that integrity of information and availability of systems and data are not compromised. A crucial component of establishing sound computer security management involves agency-wide training and awareness. If systems and information are to be safeguarded, training at all levels must be implemented. Again, as computer systems increasingly are linked to national and international networks, effective implementation of computer security is essential.

*Information technology*

One of the purposes of the Paperwork Reduction Act when it was originally enacted was: "to ensure that automatic data processing and telecommunications technologies are acquired and used by the Federal Government in a manner which improves service delivery and program management, increases productivity, reduces waste and fraud, and, wherever practicable and appropriate, reduces the information processing burden for the Federal Government and for persons who provide information to the Federal Government;" (P.L. 96-511, sec. 2(a) (44 U.S.C. 3501(5)).

As such, information technology has been recognized from the beginning as instrumental in improving Government operations and fulfilling agency missions, including reducing the burdens imposed on persons who provide information to the Government.

Yet, the management and application of information technology to support Government operations has been a historical problem. The Comptroller General described in July 1980 that the management of automatic data processing equipment was characterized by:

(1) Overly complex and costly software that too often fails to meet user needs, is inefficient, or simply does not work; and

(2) A costly, prolonged, and ineffective acquisition process which too often emphasizes hardware characteristics over sound financial investment.

Noting that the functions assigned OMB, GSA, and the Department of Commerce under the Brooks Act were not changed by the Paperwork Reduction Act, the Comptroller General stated that, by reemphasizing the Brooks Act, the 1980 legislation attempted to strengthen the leadership and central direction provided by these agencies. Further, the consolidation within OMB of policymaking and oversight responsibilities for the other information management functions covered by the bill should enhance the capability for applying advanced information technology to the problems of controlling paperwork burdens and improving the quality of data for program management and evaluation.

To support his 1980 message, the Comptroller General listed 70 GAO reports describing deficiencies in agency information management activities, with 31 dealing specifically with information technology problems.

Agencies have continued to spend more on information technology—now in the range of $25 billion a year, and totalling about

195

## LEGISLATIVE HISTORY
### HOUSE REPORT NO. 104-37
[page 33]

a quarter of a trillion dollars in the 14 years since the passage of the Act. GAO, too, has continued to report on deficiencies related to agency information technology activities and systems development efforts. In a February 1992 report summarizing 132 reports it issued between October 1988 and May 1991, GAO described ten categories of problems:

Inadequate management of information systems development life cycle;

Ineffective oversight and control of IRM;

Cost overruns in information systems development efforts;

Schedule delays in information systems development efforts;

Inaccurate, unreliable, or incomplete data;

Inability to ensure the security, integrity, or reliability of information systems;

Inability of systems to work together;

Inadequate resources to accomplish IRM goals;

Systems that make access to data time-consuming or cumbersome; and

Systems that were not performing as intended.

(See "Information Resources: Summary of Federal Agencies' Information Resources Management Problems," GAO/IMTEC–92–13FS, February 13, 1992.)

Described previously in the Information Resources Management section of this report (and summarized in the appendix) is a report by GAO describing ways that agencies can employ practices used by leading organizations in the private and public sectors to manage their information technology. This report, "Executive Guide: Improving Mission Performance Through Strategic Information Management and Technology," (GAO/AIMD–94–115, May 1994), describes 11 practices with related attributes and suggestions to agencies on how to get started in implementing the specific practice for better managing information and information technology.

Gene Dodaro, Assistant Comptroller General for Accounting and Information Management, GAO, testified before the Subcommittee on National Economic Growth, Natural Resources, and Regulatory Affairs, that GAO finds huge, complex information system modernizations at great risk from two basic management problems: (1) the failure to adequately select, plan, prioritize, and control system and software projects and (2) the failure to use technology to simplify, direct, and reengineer functional processes in ways that reduce costs, increase productivity, and improve service. These problems permeate critical Government operations in key agencies, such as the Federal Aviation Administration, Internal Revenue Service, Social Security Administration, and the Departments of Defense, Agriculture, and Veterans Affairs.

Mr. Dodaro singled out the following changes included in H.R. 830 that are patterned after GAO's "best practices" and will help deal with these problems:

Current provisions in the Act place the responsibility for effective information management and technology on the designated IRM senior officials and their respective organizational units. Section 3506 of the bill modifies this by strengthening the accountability of the agency head and of program managers for information resources supporting their programs.

196

## PAPERWORK REDUCTION ACT
P.L. 104–13

[page 34]

Working with the designated senior IRM official and the Chief Financial Officer, these managers are to define program information needs and develop strategies, systems, and capabilities to meet those needs. Increasing program managers' accountability and involvement focuses information management decision-making and systems development activities on measurable mission outcomes of strategic importance to the agency.

The current law also does not emphasize mechanisms for selecting, controlling, or evaluating information systems projects in ways that maximize the value of the investment or effectively identify and manage risks. Provisions in H.R. 830 call for strengthening processes that agencies use to decide their information technology expenditures and to set goals for measuring progress in using information technology to increase productivity and accomplish outcome-oriented results. Most importantly, Section 3506 requires agencies to assess and manage their information technology initiatives with defined processes for selecting, controlling, and evaluating the initiatives based on comparing anticipated benefits to actual results. Additionally, Sections 3504 and 3505 help better manage risks by requiring the OMB Director to take steps to infuse more discipline and accountability into the Government's technology expenditures.

The current law does not emphasize the necessary technical skills or the clear delineation of management roles and responsibilities, both of which are needed to manage information technology as part of an overall business strategy. Sections 3504 and 3506 of H.R. 830 require that training be developed to educate program officials and other agency managers about information technology. Section 3506 also defines the roles and relationships between program and IRM officials in the development of information systems and capabilities to meet program needs.

### G. CONCLUSION

Based on the record compiled by the Committee, during both this Congress and preceding attempts to reauthorize appropriations for the Paperwork Reduction Act since 1989 when the current authorization expired, there is ample evidence of the need to reauthorize appropriations and strengthen the Act. Improvements are needed to clarify OMB and agency responsibilities for all functional areas covered by the Act. Improvements are also needed in efforts to reduce the burden of meeting the Federal Government's information needs, increase the efficiency and effectiveness of Federal information resources management, and strengthen public participation in paperwork reduction and other IRM decisions. H.R. 830, as amended, accomplishes these purposes and the Committee strongly endorses its enactment.

### SECTION-BY-SECTION ANALYSIS

### SECTION 5001. SHORT TITLE

This legislation is entitled the "Paperwork Reduction Act of 1995."

197

SECTION 5002. COORDINATION OF FEDERAL INFORMATION POLICY

This legislation recodifies chapter 35, title 44, of the United States Code. The bill is drafted as a revision of the chapter due to the number of proposed changes to current law. These changes range from substance to style. They include the deletion of obsolete terms and provisions, the reorganization of sections for purposes of clarity and consistency, the consolidation and refinement of definitions and common terms, and the addition of new requirements to update and strengthen the original purposes of the Act. To the extent the revision is a restatement of the Paperwork Reduction Act of 1980, as amended in 1986, the legislation is a reaffirmation of the law's scope, underlying purposes, requirements, and legislative history, which remains an important explanation of the congressional intent underpinning the Act's provisions. To the extent the revision modifies provisions in current law, it is done for the purposes described below, and again, in order to further the purposes of the original law.

SEC. 3501. PURPOSES

Section 3501 maintains the Act's primary focus on minimizing paperwork burdens on the public. The bill adds several additional purposes and revises and realigns other purposes to emphasize the need to improve information resources management (IRM) as a means to minimize government costs and to improve the productivity, efficiency, and effectiveness of government programs, including the reduction of paperwork burdens and improved service delivery to the public. It promotes the theme of improving the quality and use of information to strengthen agency decisionmaking and accountability and to maximize the benefit and utility of information created, collected, maintained, used, shared, disseminated, and retained by or for the Federal Government. It emphasizes that information technology should be employed by Federal agencies to improve mission performance and reduce paperwork burdens, and that the Federal Government and State, local, and tribal governments should increase their common efforts to improve the utility and decrease the burdens of collection of information activities.

SEC. 3502. DEFINITIONS

1. The term "agency" is unchanged from current law.
2. The term "burden" is expanded with a more detailed list of descriptive examples of actions that constitute burden imposed by collections of information (e.g., the resources expended for reviewing instructions; acquiring, installing, and utilizing technology to gather, obtain, compile, or report the information; adjusting the existing ways to comply with any previously applicable instructions and requirements; searching data sources; completing and reviewing the collection of information; and transmitting the information to the requesting agency or otherwise disclosing the information as instructed by an agency). No substantive limitation is intended by the use of these examples. The Committee wants to cover all burdens associated with information collection.

The phrase "or for" an agency is added, as it is elsewhere in the legislation, to clarify that the burdens associated with providing,

198

1:06-cv-00556-GK JAG  # 52  Page 17 of 69

## PAPERWORK REDUCTION ACT

P.L. 104–13

[page 36]

maintaining, or disclosing information to or for a Federal agency, or to a third party or the public on the instruction or behalf of a Federal agency, are all equally included in the meaning of the term "burden."

3. The term "collection of information" is amended to accomplish several purposes.

First, several phrases are added (i.e., "causing to be obtained," "requiring the disclosure to third parties or the public," and "or for" an agency) to clarify that all Federally sponsored collections of information, not just those directly provided to a Federal agency, are contemplated within the meaning of the term. Information maintained, or information provided by persons to third parties, for example, is therefore covered by the Act, most particularly, the paperwork clearance requirements of sections 3506 and 3507, and the public protection provided by section 3512.

Whether a "collection of information" is conducted for or sponsored by the Federal government, rather than whether the government is the primary or immediate user of the information collected by a respondent, is the primary factor which determines whether a collection of information is covered by the meaning of the term. This clarification is intended to overturn the Supreme Court's interpretation of this term in *Dole* v. *United Steelworkers of America*, 494 U.S. 26 (1990). Agency third-party disclosure requirements are within the scope of the Act.

Second, the phrase "regardless of form or format" replaces the phrase "through the use of written report forms, application forms, schedules, questionnaires, reporting or recordkeeping requirements, and other similar methods" contained in current law. This clarifies that regardless of the instrument, media, or method of agency action, a collection of information is any agency action that calls for facts or opinions resulting from answers to identical questions, identical reporting or recordkeeping requirements, or third party information disclosure requirements. This includes any collection of information, whether the agency action is described as an information collection request, collection of information requirement, or other term. It also includes all the collection methods that are specifically listed in current law. It also includes information collection activities regardless of whether the collection is formulated or communicated in written, oral, electronic or other form, and regardless of whether the compliance is mandatory, voluntary, or needed to obtain a benefit or contract with the Federal government.

Third, the term "collection of information" replaces the terms "information collection request" and "collection of information requirement" in current law. The present definition of "information collection request" in section 3502(11), and all its uses in current law are deleted. The use of the term "collection of information requirement" in the current law's section 3504(h) is also deleted.

The use of the phrase, "collection of information," is made only for purposes of clarity and consistency. In the past, the use of separate terms created confusion about possible differences among the terms. The most significant instance involved the distinction between "information collection request" and "collection of information requirement," which was added to the Act by a floor amend-

199

1:06-cv-00556-GK    JAG    Page 18 of 20

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37

[page 37]

ment to the original 1980 legislation. In 1986, Congress amended the Act to include "collection of information requirement" in the definition of "information collection request." This action, however, left references to the two terms in the text of the Act. The current legislation conclusively ends any possible misunderstanding by creating a comprehensive definition for "collection of information" as the single term used in the Act.

4. The term "Director" is unchanged from current law.

5. The term "independent regulatory agency" is unchanged from current law.

6. A new definition is created for "information resources," which means information and related resources, such as personnel, equipment, funds, and information technology. The new definition is intended to complement the revised definition of "information resources management." Both the new definition and the amended definition serve to clarify and improve the existing law's definition of "information resources management." They make it clear that the resources to be managed are more than just information or information technology. They are those associated programmatic and managerial resources needed to perform information functions.

7. The term "information resources management" (IRM) is redefined to mean "the process of managing information resources to accomplish agency missions and to improve agency performance, including the reduction of information collection burdens on the public." This new definition is meant to further the original Act's intent to have Federal agencies better coordinate the management of information activities and associated resources. The legislation strengthens this mandate by focusing IRM on the basic reason for using information resources; i.e., to serve agency performance and efficiently and effectively accomplish agency missions, including the Act's objective of reducing public information collection burdens.

8. The definition of "information system," is updated to mean an organized and distinct or discrete set of information resources and processes, automated or manual, for any elements of the collection, processing, maintenance, use, sharing, dissemination, and disposition of information. It includes systems that provide information to top agency managers as well as systems supporting agency program operations. The previous definition of "information system" appeared to make the phrase synonymous with a "management information system." Information systems are now understood to serve a much broader range of purposes than just providing management information.

9. The term "information technology" replaces the current term "automatic data processing equipment" (ADPE) but does not change the underlying definition from the "Brooks Act" (40 U.S.C. 759). The reason for this change is that the term "information technology" has replaced "ADPE' in common usage and management practice. Moreover, as broadly defined by the Brooks Act, the term covers computer and telecommunications equipment and services. Throughout the Act, therefore, the legislation substitutes "information technology" for various references to "automatic data processing," "automatic data processing equipment," and "telecommunications." .

10. The term "person" is unchanged from current law.

## PAPERWORK REDUCTION ACT
P.L. 104–13
[page 38]

11. The term "practical utility" is broadened and clarified by dropping the phrase "it collects" from current law. This change clarifies that federally conducted or sponsored collections of information which mandate that persons provide or maintain information to or for third parties may have practical utility if the actual use of the information is necessary for the proper performance of the functions of the agency. This change is part of the Committee's intent to clarify the term in light of overturning the interpretation of "collection" by the Supreme Court in *Dole* v. *United Steelworkers of America.*

12. The term "public information" is added. It means any information, regardless of form or format, that an agency discloses, disseminates, or makes available to the public. Its application in the Act, as amended by this legislation, is primarily in the context of "dissemination" of information by an agency.

13. The term "recordkeeping requirement" is clarified by the addition of the phrase "or for" an agency. As with the definition of "burden" and "collection of information," this amendment is meant to cover instances in which information is provided, maintained, or dislocated to or for an agency. To overturn the interpretation of "recordkeeping requirement" in *Dole* v. *United Steelworkers of America,* the definition is clarified by adding at the end, the specific inclusion of "retention, reporting, notifying, or disclosure to third parties or the public of such records."

In addition to its treatment of these definitions, the legislation eliminates the following definitions as unnecessary:

"automatic data processing"—this term is replaced by the term "information technology," as described above;

"data element," "data element dictionary," "data profile," "directory of information resources," and "information referral service"—these terms are unnecessary given the legislation's revision of section 3511, regarding the Government Information Locator Service; and

"information collection request"—this term is subsumed within the definition of "collection of information," as described above.

### SEC. 3503. OFFICE OF INFORMATION AND REGULATORY AFFAIRS

Section 3503, which establishes OMB's Office of Information and Regulatory Affairs (OIRA), is amended to conform with the 1990 Chief Financial Officers Act's creation of the position of OMB Deputy Director for Management (DDM). While the OIRA Administrator is and should continue to "serve as principal adviser to the Director on Federal information resources management policy," the Committee recognizes the status of the DDM as the OMB official designated by statute to coordinate and supervise the general management functions of OMB.

### SEC. 3504. AUTHORITY AND FUNCTIONS OF DIRECTOR

Section 3504 sets out OMB's IRM authority and functions under the Act. The legislation's amendments to the section do not change the structure of OMB's functional responsibilities, but rather revise and refine the specific details under each function, and, for the first time, delineate specific "dissemination" responsibilities.

201

Case 1:06-cv-00556-GK    Document 13    Page 20 p 20

**LEGISLATIVE HISTORY**
HOUSE REPORT NO. 104-37
[page 39]

As revised, the section eliminates references to OMB as the implementing agency. This reflects the recognition that OIRA can and should provide policy and practice leadership and oversight, but cannot and should not attempt to take over operational responsibilities for agency IRM functions. For this reason, the legislation also describes detailed agency responsibilities in section 3506 to mirror the OMB functions spelled out in section 3504. This reflects a major purpose of the legislation, that is, to improve implementation of the Act by more clearly delineating agency responsibilities.

The bill also streamlines language and makes more consistent use of terms such as collection of information (e.g., instead of "information collection request" or "collection of information requirement"), information resources management, and information technology. Along these same lines of clarifying terms, section 3504(h) in current law (dealing with OMB review and approval of collections of information contained in proposed rules—an element of the so-called Kennedy Amendment to the original 1980 legislation) is moved, but without substantive change, to section 3507(d), which is the primary location of OMB paperwork review and approval provisions.

*Subsec. (a)*

As with the definition of IRM, this subsection identifies the Director's functional IRM responsibilities and focuses them on: (1) developing and coordinating governmentwide policies and guidelines, and (2) providing direction and overseeing the review and approval of the collection of information, the reduction of burden on the public, and overseeing agency use of information resources.

*Subsec. (b)*

Subsection (b), the general IRM policy functions, is amended to refer to "information resources management policy" instead of "information today." The specific requirements are then updated and streamlined—again, with a major purpose being the management of information resources.

New specific functions assigned the Director are to foster greater sharing, dissemination, and access to public information; oversee the development and implementation of "best practices" in IRM by Federal agencies; and oversee agency integration of program and management functions with their IRM functions (in many cases agencies have conducted them as separate activities as if there was no relationship between them). An agency's strategic plan (sometimes referred to as an agency business plan) should establish the mission for agency programs with performance measures to measure program performance (in accordance with the requirements of the Government Performance and Results Act) and the IRM plan should describe how information resources will be acquired and managed in support of the agency programs.

*Subsec. (c)*

The collection of information and paperwork control subsection is amended so as to fit with other sections, e.g., paperwork burden reduction goals in section 3505, agency responsibilities in section 3506, and the review and approval of proposed agency collections

202