# PAPERWORK REDUCTION ACT
P.L. 104-13

[page 60]

[By fiscal year, in millions of dollars]

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| With adjustment for inflation: | | | | | |
| Estimated authorization level | 6 | 7 | 7 | 7 | 7 |
| Estimated outlays | 5 | 7 | 7 | 7 | 7 |

The costs of this bill fall within budget function 800. Outlay estimates are based on historical spending rates for this program and assume that appropriations will be provided before the start of each fiscal year.

6. Comparison with spending under current law: OIRA's 1995 appropriation is about $6 million. If appropriations were to remain at the 1995 level, projected spending would not exceed the amount under current law. If appropriations were to increase each year to reflect anticipated inflation, budget authority and outlays would exceed levels under current law by amounts growing to $1 million in 2000.

7. Pay-as-you-go considerations: None.
8. Estimated cost to State and local governments: None.
9. Estimate Comparison: None.
10. Previous CBO estimate: On February 3, 1995, CBO transmitted a cost estimate for S. 244, the Paperwork Reduction Act of 1995, as ordered reported by the Senate Committee on Governmental Affairs on February 1, 1995. H.R. 830 is similar to S. 244.
11. Estimate prepared by: Susanne S. Mehlman.
12. Estimate approved by: Paul N. Van de Water, Assistant Director for Budget Analysis.

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of Rule XI of the House of Representatives, the Committee estimates that H.R. 830 will have no significant inflationary impact on prices and costs in the national economy.

## OVERSIGHT FINDINGS

Findings and recommendations by the Committee on Government Reform and Oversight pursuant to clause 2(l)(3)(D) of Rule XI of the House of Representatives are incorporated into the descriptive portions of this report.

The Small Business Committee also held a hearing on the Paperwork Reduction Act. Their findings are summarized in the attached letter to Chairman Clinger.

U.S. CONGRESS,
COMMITTEE ON SMALL BUSINESS,
*Washington, DC, February 13, 1995.*

Hon. WILLIAM CLINGER, Jr.,
*Chairman, Committee on Government Reform and Oversight,
U.S. House of Representatives, Washington, DC.*

DEAR CHAIRMAN CLINGER: On January 27, the Small Business Committee held a hearing on Title V, of H.R. 9, the "Job Creation and Wage Enhancement Act of 1995." Title V is entitled the "Pa-

223

# LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37

[page 61]

perwork Reduction Act of 1995."

The legislative provisions contained in this vital piece of the "Contract with America" have their origins in legislation you, Congressman Sisisky, Congressman LaFalce, myself and some 111 other members from both sides of the aisle actively cosponsored in the 103d Congress. (H.R. 2995) While we did not succeed in passing this legislation last Congress, I am very excited about the potential of working with you and the new leadership in both the House and Senate to enact similar legislation this Congress. I am one who strongly believes the Paperwork Reduction Act and the Regulatory Flexibility Act, Title VI of H.R. 9, are precisely the kind of common sense regulatory reforms that this Congress can enact, after the unsuccessful efforts of the past several years, for the benefit of small businesses and all the American people.

The Small Business Committee shares a jurisdictional interest with the Government Reform and Oversight Committee on legislation regarding paperwork reduction. Our hearing focused on the impact this and similar legislation in the Senate, S. 244, will have on the small business community. What follows is a summary of the hearing and a highlighting of several recommendations made by our witnesses which could improve the legislation. For the benefit of our colleagues who are not members of either of our Committees, I request that this letter be included in your Committee's report on H.R. 830, legislation responsive to Title V of H.R. 9 and reported favorably by your Committee on February 10th.

## WITNESSES

Ms. Sally Katzen, Administrator of the Office of Information and Regulatory Affairs, Office of Management and Budget, Executive Office of the President, presented the Clinton Administration's position on and aspirations for paperwork reduction legislation.

Mr. William Koeblitz, President and Chief Executive Officer of Med Center, Inc., of Valley View Ohio, testified on behalf of the U.S. Chamber of Commerce Federation of 215,000 businesses. He was accompanied by Nancy Fulco, Manager of Regulatory Policy for the Chamber, and David Voight, Director of the Chamber's Small Business Center. Mr. Koeblitz is a member of the U.S. Chamber's Board of Directors and the Chairman of the Chamber's Regulatory Affairs Committee.

Mr. David Massanari, M.D., a practicing family physician from Sanford, Maine testified on behalf of the American Academy of Family Physicians. Dr. Massanari serves as a member of the Board of Directors of the American Academy of Family Physicians, and chairs their Commission on Legislation and Government Affairs.

Mr. Victor Tucci, M.D., President of Three Rivers Health and Safety, in Pittsburgh, Pennsylvania testified on behalf of the National Small Business United.

Mr. Guy W. Courtney, President and Chief Executive Officer of The Machaira Group, Inc., a securities brokerage firm located in Palatine, Illinois testified as an interested small businessman. He is a delegate to the 1995 White House Conference on Small Business where he serves on the Capital Formation and Paperwork and Regulatory committees.

Mr. James P. Carty, Vice President, Small Manufacturers, testified on behalf of the National Association of Manufacturers.

224

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 62]

Witnesses from the U.S. Chamber, National Small Business United, and the National Association of Manufacturers acknowledged their participation in the Paperwork Reduction Act Coalition, a broad-based coalition which is dedicated to supporting the Paperwork Reduction Act of 1995.

SUMMARY OF TESTIMONY

All the witnesses were supportive of Title V's provisions to positively amend the Paperwork Reduction Act of 1980. All the witnesses supported correcting the problems created by the 1990 Supreme Court decision, *Dole vs. Steelworkers of America*. All but one specifically endorsed language overturning *Dole*, and which clarifies that the PRA cover all paperwork requirements, including those where the federal government mandates a private party provide or maintain information for a third party, as opposed to the federal government directly. All supported the establishment of national burden reduction goals.

Administrator Katzen noted the particular importance of paperwork reduction to small business and cited a 1987 survey conducted by Price Waterhouse which concluded that "costs involved in completing government forms—and perhaps more importantly, the time invested by senior management—are disproportionately heavy for small companies." She further cited a GAO study (GAO/PEMD-93-5) which detailed problems agencies are having implementing the Act created by the *Dole* decision. She urged the Committee focus upon the provisions of S. 244, the Senate companion to the "Paperwork Reduction Act of 1995", which she believes reflects improvements resulting from two years of "active, collaborative, bipartisan effort". She declared S. 244 has the full support of the Clinton Administration and pledged to work cooperatively with the Congress to help enact meaningful and helpful improvements to the Paperwork Reduction Act.

Mr. Koeblitz established the importance of paperwork reduction to the Chamber's membership. Each Congressional cycle, the Chamber surveys its members to determine the issues of greatest importance for the coming Congress. Out of 64 issues identified for the 104th Congress, paperwork reduction ranked third behind unfunded mandates on state and local governments, and the private sector, and welfare reform. Considering the unfunded mandates issue also involves regulatory burdens, the message was clear, the American business community wants to get back to the business of running their companies rather than devoting inordinate amounts of time responding to federal government edicts. He stressed the importance of overturning *Dole* and noted that actual paperwork and regulatory burdens imposed on the public are underestimated drastically.

Dr. Tucci displayed and explained the burden of what the material safety data sheets (MSDS) are for his company. He questioned whether the requirements for MSDS's were achieving their purpose of telling workers about chemical hazards. By implication, he noted OSHA's MSDS requirements were not covered by the PRA as a result of the *Dole* decision. He expressed the view that "bootleg" paperwork requests were proliferating as a result of the decision. He commented that NSBU's annual survey of members to identify the

225

LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 63]

"most significant challenges" to their business' growth and survival reveal that "regulatory burdens" is consistently one of the top three challenges.

Dr. Massanari stated that a family physician's practice is generally a "small business". Over a third (35.5 percent) of family physicians are in solo practice, an additional 12% are in two-person partnerships, and another third practice in small to medium sized groups. They are all overwhelmed by paperwork. The in-service and administrative structure taken for granted to exist in larger organizations, such as hospitals, simply does not exist in these small practices.

Dr. Massanari pointed to several paperwork intensive areas that could benefit from less burdensome rules if the PRA were applied properly to them. He noted the problem the *Dole* decision creates in this regard. Medicare rules and reimbursement procedures, routine and frequent Health Care and Financing Administration (HCFA) policy changes, post-payment audits, the Clinical Laboratory Improvements Act (CLIA), the training records of the OSHA blood-borne pathogen standard, home health, and nursing home regulations were cited as examples. He stressed that the Academy regards HCFA's new Medicare Carrier Manual instructions as a good test of the scope and strength of the Paperwork Reduction Act. They will be watching to see whether OIRA and OMB assert the instructions are covered by the Act and believe strengthening amendments to the law would help resolve the issue.

Mr. Courtney commented on the paperwork problems of "start-up" companies and noted the disproportionate burdens placed upon small businesses. He recommended that the goals of the Act be made an absolute requirement. He emphasized the importance of federal officials affirmatively collecting the views of small businesses before paperwork requirements were promulgated. Small business involvement should come at the beginning, not the end. Mr. Courtney described the "soft" costs associated with paperwork burdens as opposed to the "hard" costs and recommended both kinds of costs be addressed in evaluating the need for paperwork requirements.

Mr. Carty welcomed the prospect of enacting the PRA amendments after six years of effort. The NAM is a steering committee member of the Paperwork Reduction Act Coalition. He noted the historic role the Small Business Committee had played in the Federal Reports Act of 1942, the Federal Paperwork Commission of 1974 and the PRA of 1980. He emphasized the need for OIRA to be a strong regulatory "traffic cop" for the President. He described the important role the law plays to link information technology and the information age to reducing the government's off-budget burden on small businesses. He further explained how the Act's protections against bureaucratic excesses had been seriously eroded in recent times. "The problem today is the law's effectiveness has been eroded by three major factors, the Supreme Court decision, *Dole v. Steelworkers of America*; agencies who increasingly ignore the spirit and letter of the law; and six years of Congress and the Executive branch not being able to agree on what amendments are needed." Mr. Carty concluded by summarizing recommendations for the Committee's consideration.

226

## PAPERWORK REDUCTION ACT
P.L. 104-13
[page 64]

### RECOMMENDATIONS

Witnesses before the Committee specifically recommended that the Paperwork Reduction Act proposals before Congress be improved by:

Raising the goal of reducing existing paperwork burdens annually from the present proposals of 5 percent to 10 percent.

Consider making the burden reduction goals mandatory. This would require agencies to find ways to reduce burdens when they establish new ones.

Providing citizens a private right of action when the Administrator of OIRA fails to respond in writing to a properly presented inquiry on whether a collection of information is covered under the Act.

Amending the PRA to explicitly require that all recordkeeping requirements contain a specific record retention requirement. Recordkeeping requirements should not be approved unless they display how long they must be kept.

Statutorily empowering the Small Business Administration's Chief Counsel for Advocacy to address and help enforce the PRA's impact on small businesses.

Thank you for your attention to this matter.

Sincerely,

JAN MEYERS,
*Chair.*

[page 103]

### ADDITIONAL VIEWS ON OVERTURNING THE *DOLE* VS. *UNITED STEELWORKERS OF AMERICA* DECISION

Although there is bipartisan agreement on many of the provisions of the Paperwork Reduction Act Reauthorization, we must take issue with one controversial provision that the majority has unfortunately included in H.R. 830. That provision would overturn a decision by the Supreme Court in *Dole vs. United Steelworkers of America*, 494 U.S. 26 (1990), which held that the Paperwork Reduction Act does not apply to Federal requirements regarding third party notification. An amendment by Ranking Member Cardiss Collins to delete this provision was narrowly defeated by a vote of 26 to 18.

The case arose out of a 1987 Occupational Safety and Health Administration Hazard Communication Standard that required employers to inform employees of hazardous chemicals in the workplace.

Certain businesses objected to the requirements to notify their workers of hazardous chemicals at the work site, and went to the Office of Management and Budget to plead their case. Unlike the initial regulations that were developed after public comment, the OMB actions were done in secret. The business leaders convinced

227

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37

OMB to cancel the new regulations using the *Paperwork Reduction Act* as its authority.

The Steelworkers, who represented workers at both chemical plants and construction sites sued. Under OMB's ruling construction workers using paint thinned with benzene would not be told that breathing the paint fumes could cause liver damage. Nor would they be told that the fumes from welding cadmium coated reinforcement rods would cause prostate damage. Foundry workers making iron railings would not know that the dust from the sand used to cool the molds cause lung damage.

The case eventually reached the Supreme Court. In a 7-2 decision, the Court ruled that OMB had improperly interfered in the notification requirements. The Court ruled that the Act was limited to Federal requirements to report information to the Government. Requirements for notifying third parties were not covered by the Act.

H.R. 830, however, overturns this decision by explicitly amending the law to cover third party notifications. We strongly disagree with these provisions.

The intent of the Paperwork Reduction Act is clear. There are too many forms that individuals and small businesses must fill out. Requiring OMB and agencies themselves to be sensitive to this problem, and to take actions to relieve paperwork burden, is a sensible goal.

The Act was never intended as a mechanism to deny workers their rights to know about the hazards they face in the workplace.

[page 104]

The simple posting of a sign in a work site can hardly be called a paperwork burden. The objective to the sign was motivated by the contents of the sign, not its paperwork burden. Some businesses simply wanted to keep their workers in the dark.

The workplace notification regulations were not the only example of OMB interference in agency notification requirements. During the 1980's, disclosure requirements relating to aspirin labeling for Reye's syndrome were held up between 1981 and 1986, in part, due to problems with OMB clearance.

Reversing the *Dole* decision is one more example of how the Contract with America puts business ahead of people. The proponents of this provision have determined that the burden to business of informing their employees about dangers at the workplace exceed the workers' right to know. We disagree. Moreover, even were such an issue subject to debate, the decision should be made when substantive laws on the subject are enacted. The Paperwork Reduction Act should not be a tool for overturning agency policy decision that are unrelated to paperwork burdens.

CARDISS COLLINS.
FRANK MASCARA.
COLLIN PETERSON.
LOUISE SLAUGHTER.
BOB WISE.
PAUL E. KANJORSKI.
MAJOR R. OWENS.
HENRY A. WAXMAN.
EDOLPHUS TOWNS.
CARRIE P. MEEK.

228

## ADDITIONAL VIEWS ON INFORMATION DISSEMINATION PROVISION OF H.R. 830

The information dissemination provisions of H.R. 830 are principally contained in §3506(d). Most of these provisions had their historical and intellectual origins with work done by the Committee on Government Operations during the last ten years. In 1986, the Committee issued a report that was prepared by the Subcommittee on Government Information, Justice, and Agriculture chaired by Rep. Glenn English. House Report 99-560—"Electronic Collection and Dissemination of Information by Federal Agencies; A Policy Overview"—was the first comprehensive look at the policy problems presented by the electronic information revolution.

In 1990, the Committee reported the Paperwork Reduction and Federal Information Resources Management Act of 1990 (H.R. 3695) that included language setting information dissemination policy rules. That work was done by Rep. Bob Wise, who then chaired the Subcommittee on Government Information, Justice, and Agriculture, building on the foundation established in the 1986 report. H.R. 3695 passed the House at the end of the 101st Congress, but the Senate took no action.

The legislative report that accompanied H.R. 3695 contained an extensive discussion of the information dissemination language. Although some of the text has been changed, much of the policy remains identical. As a result, it is worth restating here much of that legislative history material. The material remains relevant to the current bill.

H.R. 830 includes language establishing statutory policies on the dissemination of information by federal agencies.[1] This language has been added to the Paperwork Reduction Act for three basic reasons.

First, the dissemination of information by federal agencies is an essential governmental function. The laws establishing and regulating federal agencies contain many general[2] and specific provisions requiring agencies to make records available to the public. The collection and dissemination of information is the principal mission of some agencies[3] and is necessary for the proper perform-

---

[1] The information dissemination provisions in the legislation originated with work done by the Committee in 1986. See Committee on Government Operations, "Electronic Collection and Dissemination of Information by Federal Agencies: A Policy Overview," H.R. Report No. 99-560, 99th Cong. 2d Sess. (1986) [hereinafter cited as "1986 Information Policy Report"].
[2] There are, for example, general requirements in the Administrative Procedure Act for public disclosure. 5 U.S.C. §551 et seq. (1988). See especially the Freedom of Information Act, 5 U.S.C. §552; 5 U.S.C. §552a (1988).
[3] See, e.g., 7 U.S.C. §2201 (1988) (establishing that one of the duties of the Department of Agriculture is "to acquire and to diffuse among the people of the United States useful information on subjects connected with agriculture, rural development, aquaculture, and human nutrition"); 15 U.S.C. §77f(d) (1988) (providing that the Securities and Exchange Commission shall issue regulations providing that information in securities registration statements shall be made available to the public); 29 U.S.C. §1 (1988) (providing that the general duties of the Bureau of Labor

Continued

229

---

ance of others. Other dissemination activities are regular agency functions as well.

In fact, the federal government is the largest single producer, consumer, and disseminator of information in the United States.[4] The flow of information from the federal government to its citizens is essential to the successful functioning of the democratic process and to the proper operation of the national economy.[5]

Every segment of American society needs some government information to function. These include the federal government itself, every type of business and industry, libraries[6] and schools, newspapers and television, state and local governments, and ordinary citizens.

Government information is used in many different ways. Voters may use almost any type of federal information to help make political decisions. Federal, State and local agencies use federal statistical and economic data to make social, economic, fiscal, and management decisions. Corporations rely on census information to make strategic business decisions. Contractors want to know what products and services the government needs. Most Americans rely daily on weather information from the National Weather Service.

Federal information is also a valuable economic commodity. The large and growing private information industry functions in part by taking public government data, adding value to it, and reselling it to others. There are thousands of private sector information products and services based in whole or in part on government information.[7] The nonprofit sector—including libraries and public interest groups—provides similar products and services.

The government's obligation to make data available to the public is in no way diminished by the ability of users to make a profit by reselling the information. While the private sector cannot relieve the government of its dissemination responsibilities, private dissemination of government information helps to make government information available to more users.

The press, libraries, public interest groups, nonprofit organizations, and the publishing industry and other components of the private information industry play an important role in meeting the information needs of the American public. American information products and services are valued throughout the world, and the private information industry contributes positively to our Nation's trade balance.[8]

---

Statistics are "to acquire and diffuse among the people of the United States useful information on subjects connected with labor * * * its relation to capital, the hours of labor, the earnings of laboring men and women, and the means of promoting their material, social, intellectual, and moral prosperity."). For other examples, see "1986 Information Policy Report" at 13-15.
[4] See Office of Management and Budget, "Management of Federal Information Resources," 59 Fed. Reg. 37906 (July 25, 1994) (Circular A-130).
[5] "The 'public's right-to-know' about the business of government is a fundamental principle of our democratic government and open society." "Federal Information, Justice, and Agriculture Subcommittee of the House Committee on Government Operations, 101st Cong., 1st Sess. 110 (1989) (testimony of Jerry J. Berman, Benton Foundation Fellow and Director, Information Technology Project, American Civil Liberties Union.)
[6] See "Federal Information Dissemination Policies and Practices," Hearings before a Subcommittee of the House Committee on Government Operations, 101st Cong., 1st Sess. (April 18, 1989) 284-305 (testimony of Harold B. Shill, Evansdale Librarian, West Virginia University).
[7] See id. at 240-260 (testimony of Kenneth Allen, Senior Vice President, Information Industry Association).
[8] Id. at 242 (testimony of Kenneth Allen, Senior Vice President, Information Industry Association).

230

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 107]

Second, legislation is needed because of actions taken in the executive branch. Over the last few years, the Office of Information and Regulatory Affairs at the Office of Management and Budget has become the central information policy maker for the federal government. In December 1985, OMB first issued Circular A-130 on the management of federal information resources. There have been several later versions of the Circular.[9] A key part of the circular sets out policies governing the collection and dissemination of information by federal agencies.[10]

All of this policy guidance was issued under the authority of the Paperwork Reduction Act and other statutes. But the Act currently contains no detailed dissemination provisions.[11] Until now, Congress has not provided specific directions for OMB's policy making efforts on information dissemination. H.R. 830 will fill the statutory gap, provide a clear congressional direction for dissemination policy, clarify the relationship between OMB and the agencies, and require OMB to revise its controversial guidance.

Third, changes in information technology have increased the need for legislative direction. Federal agencies are currently planning or operating many large electronic information systems. These systems raise many questions that are simply not addressed by current laws. The Paperwork Reduction Act is one of those laws. The dissemination amendments made by H.R. 830 will bring the Act more squarely into the electronic information age by encouraging federal agencies to disseminate information in electronic formats. H.R. 830 will also make federal dissemination policies more uniform.

Both H.R. 830 and the Freedom of Information Act reflect the policy that the public has a right to copy and use government information not required to be kept secret to protect a legitimate public or private interest. Permitting public use of government information is an important element of the American system of government.

The FOIA and the Paperwork Reduction Act take different approaches to fulfilling public needs for government information. The FOIA is an access statute. It requires agencies to accept and consider requests for information from the public. Information that is not exempt from disclosure must be released. Without a proper request for information, the FOIA imposes few public disclosure requirements on agencies.[12]

H.R. 830 focuses on dissemination of information by agencies. "Dissemination" refers to the distribution of government information to the public through printed documents or through electronic

---

[9] For the current version, see Office of Management and Budget, "Management of Federal Information Resources," 59 Fed. Reg. 37906 (July 25, 1994) (Circular A-130).
[10] Circular A-130 has been controversial from its inception. See, e.g., comments of Rep. Glenn English, Chairman, Subcommittee on Government Information, Justice and Agriculture (May 15, 1985) reprinted in "Electronic Collection and Dissemination of Information by Federal Agencies," Hearings before a Subcommittee of the House Committee on Government Operations, 99th Cong., 1st Sess. 467 (1985). See also "OMB's Proposed Restrictions on Information Gathering and Dissemination by Agencies," Hearing before a Subcommittee of the House Committee on Government Operations, 99th Cong., 1st Sess. (1985). Later versions cured most of the significant defects of the original 1985 circular.
[11] See, e.g., 44 U.S.C. §3504(a) (1988) (referring to "dissemination of information" in a list of OMB functions).
[12] Subsections (a)(1) and (a)(2) of the FOIA impose limited publication and affirmative disclosure obligations on agencies. 5 U.S.C. §552(a)(1), (a)(2) (1988).

231

---

[page 108]

and other media, independent of a legal obligation to respond to a request from the public for the information. An agency's obligation to disseminate information is distinct from its obligation to provide access to the information. While related in purpose and sometimes in practice, the functions can be analyzed separately.

The dissemination obligations supplement but do not replace the provisions of the FOIA and other laws specifically requiring the disclosure of public information. There is no conflict between existing statutory access principles and procedures on the one hand and dissemination requirements in H.R. 830 on the other.

To the extent that public needs are not fulfilled by an agency's dissemination activities, the access provisions of the FOIA may be used to fulfill those needs. Thus, a person unable to use an agency information product on CD-ROM can still request the information under the FOIA on paper, magnetic tape, or other electronic media. Also, information released under the FOIA is still subject to the dissemination requirements in H.R. 830.

However, an agency cannot rely on the FOIA's access provisions to fulfill general dissemination obligations. If an agency has an affirmative obligation to disseminate information, if cannot fulfill that obligation simply by entertaining access requests under the FOIA.

Improvements in the operations of the FOIA will result from a better understanding of the FOIA by the agencies and an even-handed application of the letter and spirit of the FOIA. There are few judicial precedents that interfere with such access. The "leading" case that permits withholding of electronic records has been discredited in an earlier Committee report.[13] The case has rarely been followed, and the effect of H.R. 830 is to overturn whatever remains of the holding that a government database is not an agency record and not available under the FOIA. H.R. 830 imposes a positive obligation on agencies to consider the benefits of disseminating electronically information that is published on paper.

The dissemination amendments to the Paperwork Reduction Act underscore the importance of public access to electronic records in support of the existing principles of the FOIA. These amendments encourage and direct agencies considering requests for electronic records to make the records available in accordance with the letter and the spirit of both the FOIA and the Paperwork Reduction Act.

Also, direct dissemination by agencies of electronic records as provided in this bill may reduce the number of FOIA requests for access by encouraging affirmative dissemination. Data dissemination by agencies in useful formats will be less likely to be requested under the FOIA. Nevertheless, the FOIA will always be available as an alternative mechanism to meet public access requests for information, separate from any dissemination activity by an agency.

---

[13] See the discussion of SDC v. Mathews, 542 F.2d 1116 (9th Cir. 1976), in "1986 Information Policy Report" at 27-36. Cases like SDC v. Mathews and Dismukes v. Interior, 603 F. Supp 760 (D.D.C. 1984) were probably incorrectly decided because of a lack of judicial understanding of modern information technology and the failure of the parties to explore the underlying problems with exclusive government control over data formats. Regardless of the status of these cases under the FOIA, the emphasis in H.R. 830 on making information available in a manner that promotes the usefulness of the data to the public eliminates the ability of agencies to deny access to existing electronic copies of data that must be released in hard copy formats.

232

## PAPERWORK REDUCTION ACT
P.L. 104-13

[page 109]

H.R. 830 amends § 3502 of title 44 by adding paragraph (12) defining the term "public information" as "any information, regardless of format, that an agency discloses, disseminates, or makes available to the public."

The concept of "public information" is fundamental to the information dissemination provisions of H.R. 830. The objective of the definition is to minimize disputes over what government information is subject to dissemination. The definition turns on an easily-made factual determination rather than on a complex legal one. "Public information" is information that an agency has in fact made public.

The scope of the information provisions of H.R. 830 is clearer when contrasted with the scope of the Freedom of Information Act. Under the FOIA, agencies must make determinations of disclosability only when requests are received from the public. The FOIA may require agencies to undertake a page by page review of documents to distinguish between information that must be disclosed and information that may be withheld.

No such page by page review is required under H.R. 830. The bill generally obligates agencies to provide for the dissemination of information. Fulfilling this objection for identifiable sets of information known to the public will be a sufficient task. To comply with the Paperwork Reduction Act, agencies need not review information that has not already been determined to be public. H.R. 830 will not require that agencies take steps on their own to separate disclosable information from nondisclosable information in information systems that are not currently public. However, agencies are encouraged to separate and disseminate all disclosable information.

Looked at from another perspective, all agency information may be requested under the FOIA. Some of that information must be disclosed and some can be withheld. Not all information that must be disclosed under the FOIA is identifiable at any given time. The class of information subject to the dissemination obligations of H.R. 830 is not the same as the class of information subject to disclosure under FOIA. However, once an agency has received a request under the FOIA and determined that information must be disclosed, the information is subject to the dissemination obligations of H.R. 830 because it has been released.[14]

Dissemination obligations are limited to those classes of information already publicly disclosable because of a law, agency rule or regulation, or existing agency policy or practice. Thus, no dissemination obligation arises with respect to information classified in the interest of national defense or foreign policy, information subject to restrictions under the Privacy Act of 1974, sensitive law enforce-

---

[14] The dissemination obligations for information disclosed under the FOIA does not require a separate dissemination program for each document. Each disclosed document is eligible for dissemination, but an agency should apply reasonable and practical judgment. It might make little sense to disseminate unorganized agency memoranda released under the FOIA with occasional deletions of exempt material. On the other hand, a dissemination program might be worthwhile following the disclosure of an identifiable set of documents of general public interest or a continuing series of agency decisions, policy documents, or information products. The economy and efficiency of agency operations are another factor to be considered when these decisions are made.

In practice, FOIA and dissemination activities can be related. If an agency receives a significant number of FOIA requests for the same records, the agency may choose to disseminate the information. This may reduce the case-by-case handling of FOIA requests and be cheaper and more efficient for everyone.

233

---

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37

[page 110]

ment investigatory data, or other information withheld from disclosure to protect other recognized public or private interests.

For example, an agency's personnel record system contains some information that can be disclosed publicly and some that is not available for public release. H.R. 830 creates no independent obligation to separate out these two classes of information for purposes of dissemination. If an identifiable set of public information has already been separated and disclosed (e.g., an agency telephone directory), then the agency must fulfill the dissemination obligations of H.R. 830 by considering effective dissemination methods.

By contrast, an agency with an obligation to collect securities or tariff filings and to make those documents publicly available is clearly dealing with public information under the definition. Even if a portion of the filings is not public, the dissemination obligation attaches to the remainder if the class of public information can be identified and is routinely released.

The obligation to consider alternate dissemination methods does not preordain any specific result. For example, an agency that publishes a printed telephone directory may reasonably decide that public sale of the printed directory is adequate to meet public needs. H.R. 830 does not mandate that an agency publish such a directory as an online database or on a CD-ROM disk. The judgment about the best way to meet public needs for the information is an agency decision to be made in accordance with the agency's mission and with the standards in H.R. 830.

The definition provides that information is public information regardless of format. This means that information is public information no matter what kind of medium is used during creation or storage. Information on paper, microfiche, magnetic tape, floppy disk, CD-ROM, or other media qualifies if it otherwise falls within the definition. If an agency maintains the same public information in both paper and electronic formats, the dissemination obligation arises with respect to the information in both formats.

Thus, an agency cannot fulfill its dissemination obligations by only considering public needs for a paper product. If an agency publishes information on paper, it must also consider disseminating the same information electronically. This may be accomplished by the release of a copy of a database on magnetic tape or floppy disk. The bill does not require agencies to provide online access to every database containing public information. Similarly, if an agency publishes an information product electronically, it should consider the need to disseminate the same information on paper to meet public needs not addressed by the electronic product.

An agency may consider how the availability of a product in one format affects the need to disseminate the information in other formats. An agency may reach a different result for the dissemination of paper and electronic information. For each distinct product or service, the agency must make an independent evaluation.

The term "public information" generally refers to recorded information. Information conveyed orally within an agency is not within the scope of the definition.

H.R. 830 encourages a diversity of public and private sources for information based on government public information. This language recognizes several important principles. First, government

234

# PAPERWORK REDUCTION ACT
P.L. 104-13
[page 111]

information is both a public good and an unregulated commodity. Any person may obtain uncopyrighted public information from the federal government and reuse, resell, or redisseminate it as they see fit.[15]

Support for a diversity of sources for government information is an essential feature of the structure of government information activities. The First Amendment to the Constitution, Copyright Act of 1976, Freedom of Information Act, the Paperwork Reduction Act, and other laws are consistent in supporting a completely free marketplace in government information. In a democratic society, the government should not exclusively control how its own information can be used or interpreted.

Second, both the public and private sectors play a necessary, legitimate, and distinct role in disseminating government information. By redisseminating government information, the press, libraries, nonprofit organizations, public interest groups, and the private information industry help the government meet the needs of public users by providing information products and services that the government cannot support or that are beyond the bounds of government activities. At times, the private sector, libraries, and nonprofit organization provide essential products or services to the government that the government is unable to provide for itself. A diversity of information sources for government information, and not a monopoly, best serves the public interest.

Third, the public benefits from having multiple sources for government information. Agencies should encourage a diversity of providers but may not abdicate any of their responsibilities to disseminate information because of the existence of a competing public or private sector product or service. One simple way to promote a diversity of sources is to provide electronic copies of agency databases in ways that will make it easier for public, private, and nonprofit organizations to redistribute the data.

H.R. 830 identifies several categories of dissemination activities that are prohibited, unless specifically authorized by statute. The prohibited conduct interferes with public access to government information.

First, no agency may establish an exclusive, restricted, or other distribution arrangement that interferes with timely, and equitable availability of public information to the public. The purpose of this provision is to prohibit agencies from establishing unfair monopoly distribution arrangements for public information.

The underlying policy is that public information should be disseminated to all and that no agency can or should grant itself or any other person a franchise over public information. No agency may give any user or class of users an unfair advantage in the dissemination of public information. This is fully consistent with the

---

[15] Government information is not subject to copyright. 17 U.S.C. §105 (1982). This was a deliberate choice made by the Congress to keep government data as free as possible of potential restrictions on dissemination. The policy in H.R. 830 is fully consistent with the Copyright Act. The information dissemination provisions of the Paperwork Reduction Act support the same policy objectives. See the discussion of government information and copyright law in "1986 Information Policy Report" at 23-36.

235

---

# LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 112]

policy against copyright of federal government information in section 105 of the Copyright Act.[16]

The prohibition against exclusive distribution arrangements recognizes that an agency may use a contractor or cooperative agreement to operate an information dissemination system on behalf of the agency. An agency contractor may receive public information from or on behalf of the agency and then disseminate the information to others under the contract. While such distribution arrangements have monopoly elements, they are acceptable if the distribution does not interfere with timely or equal availability of public information to the public.

In other words, a contractor may operate an information dissemination system on behalf of an agency if the contractor disseminates information to the public on the same terms (including a price no higher than the agency could charge) that the agency would if the agency operated the system itself. The bill is not intended to prevent agencies from using contractors to operate information systems if the public is not in any way disadvantaged as a result. The data must remain available to the public as provided in H.R. 830 and other laws.

No agency contractor may be permitted to make use of information—other than for legitimate agency purposes—before the information is made available to other public users. No agency contractor may be permitted to discriminate among public users or to deny, delay, or otherwise limit access or charge higher prices to users who may be competitors with the contractor in the commercial marketplace for agency information.

Second, no agency may restrict or regulate the use, resale, or redissemination of public information products or services by the public. Except where a statute specifically authorizes such as restriction, public information may continue to be used, republished, resold, extracted, and redisseminated in any way by any person.

This prohibition is also fully consistent with the policy against federal government copyright in section 105 of the Copyright Act. The federal government has expressly disclaimed the ability to control the republication and reuse of its information. The language in H.R. 830 underscores that policy and strengthens it by prohibiting copyright-like controls, licensing agreements, and any other agency actions that have the effect of restricting use or redisclosure of public information.

Many companies republish government data on paper or electronically. They are free to do so and to resell government data, in whole or in part, at any price that the public is willing to pay. An agency may not justify restrictions on public data on the grounds that the information will be misquoted, misunderstood, or misused. These are consequences of the free marketplace in speech and ideas that is at the heart of American democracy. Similarly, an agency may not withhold public data because it is incomplete, embarrass-

---

[16] The inability of the federal government to copyright information in the United States does not necessarily mean that the government cannot copyright information abroad. Nothing in H.R. 830 limits the ability of the federal government to copyright information in other countries. However, the federal government may not impose any domestic restrictions on information that are inconsistent with H.R. 830 in order to preserve rights under foreign copyright laws. Assuring unrestricted domestic use is a higher priority than preserving foreign copyright rights or foreign commercial opportunities.

236

## PAPERWORK REDUCTION ACT
P.L. 104-13
[page 113]

ing to the agency, or part of a larger value-added agency product or service.

The evils of government restrictions on use of public information—including political control of speech and higher prices—are considerably worse than anything that could result from any use of public information. Agencies may, of course, take lawful actions to ameliorate any potential negative consequences that result from the way in which others use government information.

Third, agencies are prohibited from charging fees or royalties for resale or redissemination of public information. Any person who has acquired public information may use it, sell it, or otherwise disseminate it without paying any additional fees or royalties to the government. Public information may be used, sold, or redisseminated whether or not the person paid any fees to the government to obtain the information. This prohibition is also fully consistent with the policy against federal government copyright in section 105 of the Copyright Act.

The prohibitions against restrictions and against royalties follow directly from the statutory limitation against government copyright. Copyright is the mechanism available to authors to prevent others from using or reselling their work. Since the government has disclaimed the ability to copyright its own information, it has also disclaimed the ability to restrict use of data and to charge royalties. The prohibitions in H.R. 830 are simply in furtherance of federal copyright policy that has been in place since the beginning of the century.

Fourth, agencies are prohibited from establishing user fees for public information products that exceed the cost of dissemination. This is consistent with a previous finding and recommendation made by the Committee in 1986.[17] While current user fee policies for other goods and services may support other types of price structures, information products can only be priced at cost of dissemination.[18] The government should not treat its information dissemination activities as general revenue sources. It is the policy of H.R. 830 that the government should not make a profit by selling public information collected and compiled at taxpayer expense to the American public.[19]

Costs of data creation, collection, processing, and similar functions are not recoverable from public users. Typically, these costs would be incurred by the government whether or not the information is disseminated to the public. Thus, if the government produces a CD-ROM that it uses itself, the entire cost of organizing the data, formatting and mastering the CD-ROM, writing software

---

[17] "1986 Information Policy Report" at 10, 12.
[18] "1986 Information Policy Report" at 10, 12, 40–43. See also the January 12, 1990, opinion by the Comptroller General regarding the pricing of information services by the Library of Congress. GAO found that the User Fee Statute, 31 U.S.C. §9701, did not support fees for information based on a subscriber's use of data. GAO noted that the enforcement of licensing agreements that reimburse an agency for lost sales appear questionable in light of the policy of the Copyright Act. If there was ever any doubt on this point, either before or after the GAO decision, H.R. 830 resolves the matter definitely.
[19] Agencies specifically authorized by statute to set fees for information products on an alternate basis may continue to do so. An example of another statute that specifically authorizes fees is 44 U.S.C. §1708 (authorizing the Public Printer to set charges at cost plus 50 percent). The User Fee Statute, 31 U.S.C. §9701, does not qualify. See also the remarks of Rep. Glenn English, 132 Cong. Rec. H9484 (October 8, 1986) (daily edition) (describing statutes providing alternate fees for purposes of the Freedom of Information Act).

---

## LEGISLATIVE HISTORY
HOUSE REPORT NO. 104-37
[page 114]

and manuals, and any other overhead costs are not recoverable from the public. Even if only a single CD-ROM is used for archival purposes by the government, none of these costs is recoverable.

When an agency offers different information products, the fees for each product should be based on the cost of providing that product. Costs that cannot be clearly identified with an individual product should be allocated in a reasonable manner. Any unrecoverable expenses associated with dissemination within the agency, to other agencies, to other governmental entities, or under a fee waiver may not be recovered from public users.

The cost of dissemination pricing standard does not affect fees chargeable under the Freedom of Information Act or by the Government Printing Office. In both cases, a specific alternate fee structure is expressly authorized by law.

New language in H.R. 830 would allow the Director of OMB to waive the cost of dissemination pricing standard. This authority is dangerous and could easily be misused. For example, unfavorable information could be given a high price to make it difficult to obtain. Information could be highly priced to allow favored agencies or private companies to make large profits by making competing government products very expensive. It is to be hoped that the Director of OMB will use the authority very sparingly, if at all.

One protection that is afforded by H.R. 830 is the prohibition against restrictions on use, resale, or redissemination. If a particular information product is highly and unfairly priced, the first purchaser will be able to copy the information and resell it to others at a lower price. Since government information cannot by copyrighted, a high price cannot be sustained artificially. This will help curb any temptation to use information as a source of revenue.

BOB WISE.
GARY CONDIT.

LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99

[page 27]

## HOUSE CONFERENCE REPORT NO. 104-99

### JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF THE CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 244) to further the goals of the Paperwork Reduction Act to have Federal agencies become more responsible and publicly accountable for reducing the burden of Federal paperwork on the public, and for other purposes submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report: The House amendment struck all of the Senate bill after the enacting clause and inserted a substitute text.

The Senate recedes from its disagreement to the amendment of the House with an amendment that is a substitute for the Senate bill and the House amendment. The differences between the Senate bill, the House amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor and clerical changes.

### Short title (sec. 1)

The Senate bill contained a provision (section 101) that would establish the short title of the title I of the Senate bill as the "Paperwork Reduction Act of 1995".

The House amendment (section 1) contained a provision that would establish the short title of the act as the "Paperwork Reduction Act of 1995".

The conferees agree that the short title of the act should be the "Paperwork Reduction Act of 1995".

### Coordination of Federal information policy (sec. 2)

The Senate bill contained a provision (sec. 102) that would provide a complete text of chapter 35 of title 44, United States Code, the codified version of the Paperwork Reduction Act of 1980, as previously amended.

The House amendment contained a similar provision (sec. 2).

The conference agreement reflects the following differences between the text of the Paperwork Reduction Act as contained in the Senate bill and the text contained in the House amendment.

Section 2 of the Paperwork Reduction Act of 1995 is drafted in the form of a complete recodification of chapter 35 of title 44, United States Code, due to the number of changes made. The modifications include word changes made for reasons of clarity and consistency, the deletion of obsolete provisions, the reorganization of sections, and substantive amendments made to update and strengthen

239

[page 28]

the original purposes of the Paperwork Reduction Act of 1980. As stated in report accompanying the S. 244 (S. Rpt. 104-8):

"To the extent the legislation is a restatement of the 1980 Act, as amended in 1988, the scope, underlying purposes, basic requirements, and legislative history of the law are unchanged. To the extent the legislation modifies provisions in current law, the amendments are made strictly for the purposes described in this report, and in order to further the purposes of the original law." (S. Rpt. 104-4 at page 3)

The report accompanying H.R. 830, H. Rpt. 104-37, expressed essentially the same views regarding the preservation of the Act's legislative history. (See, H. Rpt. 104-37 at page 35).

With respect to the views expressed in the reports accompanying S. 244 and H.R. 830 regarding the effect of the adopted format of both bills, a recodification of chapter 35 of title 44, United States Code, the conferees adopt and reiterate the positions expressed by those reports. Amendments to current law effected by this conference agreement are done for the purposes subsequently described in this Joint Explanatory Statement.

2. Definition of "collection of information".

The Senate bill contained a modified definition of "collection of information", which included adding a cross-reference to 35 U.S.C. 3518(c)(2) relating to the exclusion of certain types of collections of information from coverage under chapter 35 of Title 44.

The House amendment contained no similar modification to existing law.

The House recedes.

The conferees expressly note that the addition of the cross-reference to 35 U.S.C. 3518(c)(2) within the definition of the term "collection of information" is not intended to reflect any substantive change to existing law or to serve as a justification for any change by Federal agencies in the use of the authority granted by section 3518(c)(2).

3. Definition of "information system".

The Senate bill contained an expanded definition of "information system".

The House amendment added the phrase "and processes, automated or manual".

The House recedes.

4. Definition of "information technology".

The Senate bill contained a new definition of "information technology" (44 U.S.C. 3502(9).

The House amendment contained a similar definition that did not contain some of the cross-references.

The House recedes.

The conferees note that the definition of "information technology" contained in section 3502(9) is intended to preserve the exemption for intelligence and military information technology that is found in current law, Specifically the definition of "automatic data processing", Section 3502(2). For the purpose of mere statutory simplification, the current exemption was incorporated by a simple reference to the so-called "Warner Amendment" to the Brooks Automatic Data Processing Act, Section 111(a)(3)(C) (i) through (v) of the Federal Property and Administrative Services Act of 1947

240

PAPERWORK REDUCTION ACT
P.L. 104-13

[page 29]

(40 U.S.C. 759(a)(3)(C)(i)—(v)). As under current section 3502(2), the exemption applies to information technology, the function, operation, or use of which involves activities specified in the "Warner Amendment", namely: intelligence activities; cryptologic activities related to national security; the direct command and control of military forces; equipment which is an integral part of a weapon or weapons system; or information technology that is critical to the direct fulfillment of military or intelligence missions (but excludes information technology used for routine administrative and business applications, such as payroll, finance, logistics, and personnel management).

In this regard, the conferees note that OMB has not interpreted the authority granted by section 3504(f)(1) of the existing Paperwork Reduction Act to oversee the management of either classified or unclassified information which would typically be resident in information technology that itself is not subject to OMB's oversight under the Act (e.g., an information system which is an integral part of a weapons system). Given the express intent to preserve existing law regarding the exclusion of information technology covered by the so-called "Warner Amendment" to the Brooks Automatic Data Processing Act, the conferees would note that the changes made by this Act do not grant any new authority or diminish any existing authority for OMB to develop or oversee security policies, principles, or guidelines applicable to information resident in information technology subject to the "Warner Amendment" exemption. Similarly, the amendments made by this definition change are not intended to impair OMB's budgetary oversight of such information technology or its other existing authorities.

With regard to the modifications being made to section 3504(f)(3) of existing law, the conferees intend that revised section 3504(g)(2) continue to be implemented consistent with the provisions of the Computer Security Act of 1987 (40 U.S.C. 759), which assigns to the National Institute of Standards and Technology responsibility for developing technical, management, physical, and administrative policies, principles, standards, and guidelines for the cost-effective security and privacy of sensitive information in Federal computer systems subject to that act.

5. Definition of "recordkeeping requirement".

The Senate bill contained a modified definition designed to make explicit the Act's coverage of so-called third-party recordkeeping requirements to correct the ambiguity that lead to the adverse 1990 Supreme Court decision in *Dole v. United Steelworkers of America*.

The House amendment contained additional detail in this regard.

The Senate recedes with a clarifying amendment.

6. Office of Information and Regulatory Affairs—Qualifications of Administrator and Employees.

The Senate bill added a new subsection (c) to section 3503 regarding the professional qualifications of the Administrator of the Office of Information and Regulatory Affairs (OIRA) and the employees of that office.

The House amendment contained no similar provision.

The Senate recedes.

241

LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99

[page 30]

The conferees note that the purpose of this provision was to assure that adequate attention was given to the full range of responsibilities assigned to OIRA and its Administrator by the Paperwork Reduction Act of 1980, as amended. Such considerations are appropriate in the Presidential selection of a nominee for OIRA Administrator and in the Senate's consideration of that nominee, while recognizing the practical realities of requiring that a "qualified" candidate have substantial capabilities over the very broad range of responsibilities assigned to OIRA by the Act. Such practical considerations should also apply to the Administrator's selection of OIRA employees as well as the utility of having more narrowly focused "subject matter specialists" available on the OIRA staff.

7. Authority and functions of the Director—Burden reduction as an objective of information resources management.

The Senate bill contained a substantial modification to section 3504(a)(1) regarding the responsibilities of the OMB Director to oversee the Government's information resources with the objective of improving the effectiveness of Federal agency operations.

The House amendment contained no similar provision.

The House recedes with an amendment that adds to the Senate provision the concept that information resources management is also a substantial tool to minimize the burdens which the Government imposes on the public.

8. Authority and functions of the Director—Approval of proposed collections of information.

The Senate bill contained a modification to section 3504(a)(1)(B)(i) relating to the authority of the OMB Director to review and approve (or disapprove) a collection of information being proposed by an agency.

The House amendment includes a similar provision which retains the explicit reference to "review and approval" existing in current law.

The Senate recedes.

The conferees reiterate the existing interpretation of the authority granted to the OMB Director under section 3504(a)(1)(B)(i): that the power to "approve" a proposed agency paperwork requirement is the power to disapprove such a proposed collection. This has been the consistent interpretation of this provision since the enactment of the 1980 Act.

9. Authority and functions of the Director—Standard of Review for Proposed Agency Collections of Information.

The Senate bill amended section 3504(c)(1) regarding the OMB Director's authority to review and approve a proposed agency collections of information, seeking to cross-reference, and paraphrase, section 3508 which sets forth the Act's fundamental standard for the review of such a proposed collection of information by both the proposing agency and the OMB Director.

The House amendment included a direct statement of the OMB Director's authority to review and approve proposed agency collections of information.

The Senate recedes.

10. Authority and functions of Director—Coordination with Office of Federal Procurement Policy regarding payment.

242

## PAPERWORK REDUCTION ACT
P.L. 104-13
[page 31]

The Senate bill contains a modification to section 3504(c)(2) relating to establishing a formal coordination between OIRA and the Office of Federal Procurement Policy (OFPP) regarding minimizing paperwork burdens associated with the Federal procurement process.

The House amendment contained a similar provision, but specifically identified the burdens associated with the payment of contractors for work performed.

The Senate recedes.

The conferees note that the Prompt Payment Act Amendments of 1988 specifically encourage the use of electronic fund transfers for the payment of contractors. More recently, the Federal Acquisition Streamlining Act of 1994 (FASA) continues this emphasis on increasing the use of electronic fund transfers by designating electronic payment of contractors as one of the benchmarks for determining the full capability of FACNET. Finally, the conferees note that simplified procedures for solicitation and award of contracts below the Simplified Acquisition Threshold (SAT), $100,000, being proposed as amendments to the Government-wide Federal Acquisition Regulation (FAR), should include authority for equally expedited contract payment procedures for work performed.

11. Authority and functions of Director—Special small business size standard for Paperwork Reduction Act.

The House amendment modified the OMB's Director's responsibilities under section 3504(c) by adding a new paragraph (6) which placed a special emphasis on minimizing the burden on small businesses with 50 or fewer employees. New section 3504(c)(6) was added as a floor amendment to the reported House bill, H.R. 830.

The Senate bill contains no similar provision.

The House recedes.

The conferees note that the section 3 of the Small Business Act provides Government-wide authority for the Small Business Administration (SBA) to establish by regulation numerical size standards under which a business concern will be recognized as a small business concern. SBA has established specific size standards for various types of business concerns in consonance with the system of standard industrial classification (SIC) codes, used to categorize business activity. Size standards are generally established by number of employees for firms engaged in manufacturing. Size standards for firms providing services are established on the basis of annual gross receipts averaged over a three-year period.

Statutorily-established small business size standards have generally been avoided by the Congress because of their rigidity. If enacted, such a statutory size standard has generally been used to establish with certainty a "small business" exception to the statute's general applicability or a threshold for a phased-in application.

12. Assignment of tasks and deadlines—Government-wide paperwork burden reduction goals.

The Senate bill amends section 3505(a) to provide for a 5 percent Government-wide goal for the reduction of paperwork burdens imposed by the Government on the public.

The House amendment contains a 10 percent Government-wide paperwork burden reduction goal.

243

## LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99
[page 32]

The Senate recedes with an amendment. The conference agreement provides for a 10 percent goal for each of the fiscal years 1996 and 1997 and a 5 percent goal for each of the fiscal years 1998 through 2001.

The conferees note that the Government-wide paperwork reduction goal is calculated on the basis of a "baseline" which is the aggregate paperwork burden imposed during the prior fiscal year. The conferees also note that individual agency goals negotiated with OIRA may differ depending on the agency's potential to reduce the paperwork burden such agency imposes on the public. Goals negotiated with some agencies may substantially exceed the Government-wide goal, while those negotiated with other agencies may be substantially less.

13. Assignment of tasks and deadlines—Pilot projects to test alternative practices to minimize paperwork burdens.

The Senate bill amends Section 3505 to provide statutory authority for the OMB Director to establish voluntary pilot programs to test alternative policies, practices, regulations and procedures to minimize the information collection burden imposed on particular segments of the public.

The House amendment included a new subsection (b) to Section 3505, which specifically authorized the OMB Director to waive the application of any regulation or administrative directive needed to undertake a burden reduction pilot project. Notice of such waiver was required to the public and the Congress.

The Senate recedes with an amendment. The conference agreement does not provide any authority for the OMB Director to unilaterally waive any regulation in support of a burden reduction pilot project. If a regulation must be waived in support of such a pilot project, such regulatory waiver must be: (1) permissible under the statutory authority underpinning the regulation; and (2) implementation through a formal regulatory change, meeting the same Administrative Procedure Act standards as used to promulgate the regulation proposed for waiver.

14. Federal agency responsibilities—DOD and Military departments authorized to designate multiple "senior officials".

The Senate bill preserves existing law in section 3506(a)(2)(B) which permits the Secretary of Defense and the Secretary of a Military Department to designate multiple "senior officials" responsible for the Act's implementation within the Office of the Secretary of Defense or that Military Department. The Senate bill amends existing law to require that the respective duties of each such "senior official" be clearly delineated if either the Secretary of Defense or a Service Secretary should choose to designate more than one such "senior official". Under current law, only the Secretary of a Military Department has a statutory obligation to delineate the respective duties of multiple "senior officials" designated by such officer.

The House amendment uses the terminology of "a senior official", under the legislative drafting convention that the singular provides for the plural, unless expressly prohibited. The House amendment preserved the statutory anomaly exempting the Secretary of Defense from the requirement to delineate the respective duties of multiple "senior officials" within the Office of the Sec-

244

## PAPERWORK REDUCTION ACT
P.L. 104-13
[page 33]

retary of Defense, (although three such "senior officials" are currently designated and their respective duties are delineated).

The House recedes.

15. Federal agency responsibilities—Cross-reference to "Fast Track" Procedures under Section 3507(j).

The House amendment to section 3506(c)(2)(A) qualifies the general requirement to provide a 60-day period for public comment on a proposed collection of information with the phrase "except for good cause" to provide broad authority to the OMB Director to waive the public participation requirement when necessary.

The Senate bill amends section 3507(j), which authorizes the so-called "Fast Track" review procedures (that is, the very expedited review of a proposed collection of information without any opportunity for public comment prior to approval), to obtain the same statutory objective sought by the House amendment.

The House recedes with an amendment. The conference agreement provides for adding to section 3506(c)(2)(A) a cross-reference to the "Fast Track" authority provided in section 3507(j).

16. Federal agency responsibilities—Record retention period to be specified for any recordkeeping requirement.

The House amendment adds a provision to Section 3506(c)(3) which would require that any recordkeeping requirement specify the length of time such records must be maintained.

The Senate bill does not contain a similar provision.

The Senate recedes.

17. Federal agency responsibilities—Special small business size standard for Paperwork Reduction Act.

The House amendment adds a provision to Section 3506(c) relating to agency responsibilities regarding minimizing paperwork burdens imposed on the public by requiring that a special emphasis be placed on minimizing the burden on small businesses with 50 or fewer employees. New Section 3506(c)(4) was added as a floor amendment to the reported House bill, H.R. 830.

The Senate bill contains no similar provision.

The House recedes.

The conferees note that section 3 of the Small Business Act provides Government-wide authority for the Small Business Administration (SBA) to establish by regulation numerical size standards under which a business concern will be recognized as a "small business concern." SBA has established specific size standards for various types of business concerns in consonance with the system of standard industrial classification (SIC) codes, used to categorize business activity. Size standards are generally established by number of employees for firms engaged in manufacturing. Size standards for firms providing services are established on the basis of annual gross receipts averaged over a three year period.

Statutorily-established small business size standards have generally been avoided by the Congress because of their rigidity. If enacted, such a statutory size standard has generally been used to establish with certainty a "small business" exception to a statute's general applicability or to define a threshold for a phased-in application.

18. Federal agency responsibilities—Information dissemination standards.

245

## LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99
[page 34]

The Senate bill adds a new Section 3506(d) which establishes information dissemination standards for the various Federal agencies.

The House amendment contains essentially similar provisions, except that the House provision requires that: (a) the public have "equal" as well as "timely" and "equitable" access to the information collected by the agency; and (b) access be made available to the "underlying data", if an agency provides information to the public in an electronic format.

The Senate recedes with an amendment. The conference agreement adopts the provision of the House amendment assuring public access to "underlying data" if a agency chooses to furnish information in an electronic format.

The conferees concluded that the word "equal" was unnecessary in the agreed-upon text of section 3506(d)(1), given that the statutory obligation for an agency ensure that the public has "timely" and "equitable" access to information in the possession of the agency includes the obligation to make such information available on a non-discriminatory and non-exclusive basis to any public or private entity for any lawful purpose. This obligation is sufficient to prevent agencies from discriminating against or otherwise disadvantaging any class of users, particularly commercial users.

19. Federal agency responsibilities—Notice of Changes Regarding Information Dissemination Products.

The House amendment adding a new section 3506(d), which establishes information dissemination standards for Federal agencies, includes a provision requiring an agency to provide adequate public notice when initiating, substantially modifying, or terminating a significant information dissemination product.

The Senate bill does not contain a similar provision.

The Senate recedes.

20. Federal agency responsibilities—User Fees.

The House amendment adding a new section 3506(d), which establishes information dissemination standards for Federal agencies, includes a provision specifying procedures under which an agency head can petition the OMB Director to authorize user fees in excess of the cost of dissemination, the general rule established by section 3506(d)(4)(D).

The Senate bill does not contain a similar provision.

The House recedes.

21. Federal agency responsibilities—Information Technology Management.

The Senate bill requires that each Federal agency take certain actions to "ensure" responsibility for effective management of its information technology resources.

The House amendment requires each Federal agency to "assume" responsibility for an identical set of management actions.

The Senate recedes.

22. Public Information collection activities; submission to Director; approval and delegation—Unspecified "Fast Track" Alternative.

The Senate bill amends section 3507(j) of existing law to provide additional flexibility in the so-called "Fast Track" review process, under which a proposed collection of information can be re-

246

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 35]

viewed on a very expedited schedule without any opportunity for public notice or comment prior to approval by the OMB Director.

The House amendment sought to provide the same additional flexibility by amending section 3507(b) to include any additional waiver of the normal review process "for good cause".

The House recedes.

23. Public information collection activities; submission to Director; approval and delegation—Duration of "Default" Approval.

The Senate bill requires the assignment of a valid control number permitting an agency to use a collection of information for a period of not more than two years, if the OMB Director fails to take action regarding a proposed collection of information (not contained in a rule) within a specified 60-day period.

The House amendment contained an identical provision, except that the control number remained valid for not more than one year.

The Senate recedes.

24. Public information collection activities; submission to Director; approval and delegation—Standard for disapproval of a collection of information contained in a final agency rule.

The House amendment to new section 3507(d), which specifies procedures for the review of a proposed collection of information contained in a proposed rule, includes a modification to section 3507(d)(4)(C), to make more explicit the standard of review to be used by the OMB Director.

The Senate bill makes use of the language found in existing law.

The House recedes.

25. Public information collection activities; submission to Director; approval and delegation—"Whistleblower" Protection.

The Senate bill includes a new provision at section 3507(e)(3)(B), which provides anonymity to a communication received by OIRA from a private sector "whistleblower", regarding an unapproved (or so-called "bootleg") collection of information.

The House amendment contained a whistleblower protection provision that was not restricted to "bootleg" collections of information.

The House amendment maintains current law.

The Senate recedes.

26. Public information collection activities; submission to Director; approval and delegation—"Whistleblower" Protection.

The Senate bill expands the Act's current requirement to disclose any written communication regarding a proposed collection of information between a person not employed by the Federal Government and the OIRA Administrator or any OIRA employee to include the "Office of the Director" of OMB.

The House amendment maintains current law.

The Senate recedes.

The House recedes with an amendment. The conference agreement provides the "whistleblower" protection to a communication regarding a collection of information that does not display a control number that is currently in effect. Thus, the provision now provides protection regarding communications relating collections of information that were never approved as well as those for which an approval has expired.

247

---

LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99
[page 36]

27. Public information collection activities; submission to Director; approval and delegation—Improved "Fast Track" Procedures.

The Senate bill amends section 3507(j) of existing law to provide additional flexibility in the so-called "Fast Track" review process, under which a proposed collection of information can be reviewed on a very expedited schedule without any opportunity for public notice or comment prior to approval by the OMB Director.

The House amendment reflects existing law.

The House recedes.

The conferees note that no instance has been identified in the 15 years of experience under the Act in which its "Fast Track" review procedures have not been made available to an agency under the current version of section 3507(j), or the proposed collection of information has not been cleared on a schedule that completely accommodated the agency's exigent circumstances.

28. Determination of necessity for information; hearing.

The Senate bill modifies section 3508 of the Act, which establishes the fundamental standard used by the Director in determining whether to approve a collection of information being proposed by an agency.

The House amendment reflects existing law.

The Senate recedes.

29. Establishment and operation of Government Information Locator Service—Specific exclusion for CIA "operational files".

The Senate bill includes a provision which provides for the establishment and operation of the Government Information Locator Service (GILS). The Senate provisions includes an explicit exclusion from GILS for "operational files" as defined in the Central Intelligence Agency Information Act.

The House amendment contains an identical provision regarding GILS, but does not include the specific exclusion for the CIA's "operational files".

The House recedes.

The Senate recedes.

30. Public Protection.

The Senate bill contains a provision which changes the Act's current "public protection" provision by requiring a collection of information subject to the Act display a notice that a person is not required to respond to the collection of information unless it displays a control number which is valid.

The House amendment contains a provision which clarifies and strengthens the Act's current "public protection" provision by enabling a person to assert this protection at any time during an agency administrative process or any subsequent judicial review of an agency action involving a penalty.

The Senate recedes with an amendment. The conference agreement clarifies and strengthens the Act's "public protection" provision by explicitly providing that the protection provided by the section may be asserted or raised by a person in the form of a complete defense, bar or other manner, at any time during a agency administrative process or any subsequent judicial review. The protection provided by the section applies if the agency fails to display a valid control number, or inform the person that they are not re-

248

## PAPERWORK REDUCTION ACT
P.L. 104-13
[page 37]

quired to respond to a collection of information unless it displays a valid control number.

For collections of information contained in a rule, agencies must provide the required information in a manner reasonably calculated to inform the public. Notice may be provided in the preamble to a final rule containing the collection of information, or in a general notice in the volume of the Code of Federal Regulation in which the agency's regulations appear.

The conference agreement also provides for the inclusion of a definition of "penalty", a term used in section 3512. The new statutory definition of "penalty" is substantially identical to the definition of "penalty" found in the Act's implementing regulations, at 5 C.F.R. 1320.7(m).

The conference agreement further provides for an additional modification to section 3506(c)(1)(B), which specifies the information to be provided to the public with respect to an agency collection of information. Agencies are now required to inform recipients of a collection of information that: (a) section 3507(a) prohibits an agency from conducting or sponsoring an unapproved collection of information; and (b) section 3512 requires an agency to inform a person who is to respond to a collection of information they are not required to do so unless it displays a valid control number.

31. Responsiveness to Congress—Annual Report and Remedial Program Regarding Agencies Failing to Attain Paperwork Burden Reduction Goals.

The Senate bill amended section 3514(a)(1) of the Act regarding the content of the report submitted annually to Congress by the OMB Director relating to agency compliance with the Act.

The House amendment contains a substantially identical provision which includes an additional requirement to identify those agencies that have failed to attain their assigned paperwork burden reduction goals during the fiscal year covered by the report, the reasons for their failure to attain such goals; and the agency's proposed remedial program, if any.

The Senate recedes with a clarifying amendment.

32. Consultation with other agencies and the public.

The Senate bill contains a provision permitting any person to request the OMB Director to determine whether a collection of information is in compliance with the Act's requirements, specifying response times to such requests; and empowering the Director to seek any appropriate remedial action.

The House amendment contains a substantially identical provision, but unlike the Senate bill requires that the person making the request must be a recipient of the collection of information at issue.

The House recedes.

33. Effect on existing laws and regulations.

The Senate bill includes a provision, section 3818(c), substantially identical to existing law which specifies certain classes of collections of information that are exempt from the Act's coverage.

The House amendment makes a number of additional modifications to this provision of existing law.

The House recedes.

34. Authorization of Appropriations.

249

---

## LEGISLATIVE HISTORY
HOUSE CONF. REP. NO. 104-99
[page 38]

The Senate bill amends section 3520 providing a five-year authorization of appropriations for OIRA for the Fiscal Years 1996 through 2000, at the rate of $8 million per year.

The House amendment provides a permanent authorization of appropriations, specifying "such sums as may be necessary" rather than a fixed amount.

The House recedes an amendment. The conference agreement provides for a six-year authorization of appropriations for OIRA, for fiscal years 1996 through 2001, at $8 million for each fiscal year.

*Burden reduction regarding the Quarterly Financial Report Program at the Bureau of the Census (Sec. 3)*

The Senate bill contained a provision (sec. 103) that would require the Bureau of the Census within the Department of Commerce to undertake a demonstration program to reduce the burden imposed on firms, especially small businesses, required to participate in the survey used to prepare the Quarterly Financial Report for Manufacturing, Mining, and Trade Corporations.

The House amendment contained no similar provision.

The House recedes with an amendment.

The conference agreement amends section 91 of title 13, United States Code, the statutory authorization for the survey, to:

(a) exempt firms from participation for specified periods, after they have fully participated in the survey for a complete cycle (eight consecutive quarters of reporting;

(b) expand the use of statistical sampling techniques to select for survey participation; and

(c) assure small businesses selected to participate easy access to advise and similar assistance, including the establishment of a toll-free telephone number.

*Effective date (Sec. 4)*

The Senate bill contains a provision (sec. 106) which establishes the effective date of the Paperwork Reduction Act of 1995 as June 30, 1995.

The House amendment contains a provision (sec. 3) which establishes the Act's effective date as October 1, 1995.

The Senate recedes with a clarifying amendment.

The conference agreement provides that: (a) except as otherwise provided, the Paperwork Reduction Act of 1995 shall take effect on October 1, 1995; (b) section 3520, as amended, providing authorization for OIRA's appropriation, shall become effective on the date of enactment; (c) for each collection of information for which there is a valid OMB control number in effect on September 30, 1995, the amendments to chapter 35 of title 44, shall take effect on the date of the first renewal or modification to that collection of information or on the date of the expiration of its OMB control number, and (d) prior to such renewal, modification, or expiration of its OMB control number, such collection of information shall be subject to the provisions of chapter 35 of title 44, United States Code, as in effect on September 30, 1995.

250

PAPERWORK REDUCTION ACT
P.L. 104-13
[page 39]

PROVISIONS NOT ADOPTED

*Oregon Option proposal*

The Senate bill contains a provision (sec. 104), added as an amendment to the bill as reported, which would express a series of findings and a statement of support on the part of the Senate regarding continuation of an on-going demonstration program of intergovernmental cooperation between the Federal Government and State of Oregon and its local governments, referred to as the "Oregon Option".

The House amendment contains no similar provision.

The Senate recedes.

*Termination of reporting requirements*

The Senate bill contains a provision (sec. 105), added as an amendment to the bill as reported, which would terminate all statutorily-mandated reports by the Executive Branch to the Congress, except those required by the Inspector General Act of 1978 and the Chief Financial Officers Act of 1990, five years after the date of enactment of the provision.

The House amendment contains no similar provision.

The Senate recedes.

*Federal Report Elimination and Modification Act of 1995*

The Senate bill contains a Title II, the "Federal Report Elimination and Modification Act of 1995", added as an amendment to the bill as reported, which would eliminate or reduce the burden of 212 statutorily-mandated reports by the Executive Branch to the Congress.

The House bill contains no similar provisions.

The Senate recedes.

BILL CLINGER,
JOHN M. MCHUGH,
DAVID MCINTOSH,
JON FOX,
CARDISS COLLINS,
COLLIN C. PETERSON,
BOB WISE,
   *Managers on the Part of the House.*

WILLIAM V. ROTH, Jr.,
BILL COHEN,
THAD COCHRAN,
JOHN GLENN,
SAM NUNN,
   *Managers on the Part of the Senate.*

251